# 14-1652-BK

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤ ◄◄

IN RE: THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., ET AL.,

*Debtor.*

N. PROVIDENCE, LLC,

*Appellant,*

*v.*

THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.,

*Appellee.*

*On Appeal from the United States District Court
for the Southern District of New York (White Plains)*

## BRIEF FOR APPELLANT WITH SPECIAL APPENDIX

Jessie Christine Basner
CLEMENTE MUELLER, P.A.
*Attorneys for Appellant*
P.O. Box 1296
Morristown, New Jersey 07962
973-455-8008

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant N Providence, LLC discloses that its parent entity is a New Jersey LLC and that there is no publicly held corporation that owns 10% or more of N. Providence, LLC.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CITATIONS ................................................................................... iv

STATEMENT OF JURISDICTION .................................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................. 2

STANDARD OF REVIEW ................................................................................ 2

STATEMENT OF THE CASE ........................................................................... 4

STATEMENT OF RELEVANT FACTS ............................................................ 6

A.     The Lease and Amended Lease ............................................................ 6

B.     A&P Files Bankruptcy ......................................................................... 8

C.     Third Quarter Real Estate Taxes ......................................................... 12

D.     The Proceedings Below ........................................................................ 13

E.     The District Court's Decision ............................................................... 17

SUMMARY OF ARGUMENT ......................................................................... 19

ARGUMENT ..................................................................................................... 21

I.     THE DISTRICT COURT ERRED IN AFFIRMING THAT A&P WAS
       PERMITTED TO WITHHOLD ALL RENT AND CHARGES FOR THE
       ENTIRE PAYMENT DEFAULT PERIOD WITHOUT CREDITING THEM
       AGAINST THE CONSTRUCTION ALLOWANCE. .................................. 21

II.    THE DISTRICT COURT ERRED IN FINDING SECTION 7G AN
       ENFORCEABLE FORFEITURE UNDER NEW JERSEY LAW. ............... 28

       A.     Section 7G is a Stipulated Damages Clause
              that is an Unenforceable Penalty ................................................... 31

B.      Judged Against the Standard of Reasonableness, Section 7G of the Lease is a Punishment Provision, Thus it is Unconscionable and Not Enforceable ............33

i.      Under New Jersey Law, Where a Forfeiture or Penalty is Intended as a Means to Secure Performance and Compensation by way of Interest is available, the Court will not Enforce the Forfeiture.................39

III.   THE DISTRICT COURT ERRED IN AFFIRMING THAT A&P COULD WITHHOLD THE Q3 2011 TAXES UNDER THE LEASE AFTER NP CURED THE DEFAULT...........................................................................................................41

CONCLUSION ........................................................................................................45

CERTIFICATE OF COMPLIANCE ........................................................................46

# TABLE OF CITATIONS

## Cases

*Blake & Co. v. Smidth*, 119 A. 306, 307 (N.J. Ch. 1922) ............................................................. 41

*Brick Plaza Inc., v. Humble Oil & Refining Co.,* 526 A.2d 1139 (N.J. App. Div. 1987)............. 39

*Caruso v. Ravenswood Developers, Inc.,* 767 A.2d 979 (App. Div. 2001) .................................. 21

*Commercial Trust Co. v. L. Wertheim Coal & Coke Co.,* 102 A. 448, 452 (N.J. Ch. 1917).. 39, 41

*Dunkin Donuts of America, Inc. v Middletown Donut Corp.,* 495 A.2d 66 (N.J. 1985) .. 32, 35, 36

*Firefreeze Worldwide, Inc. v. Brennan & Assocs.,* 790 A.2d 238 (App. Div. 2002) .................. 28

*Galka v. Tide Water Associated Oil Co.,* 30 A.2d 881 (N.J. Ch. 1943) ................................ 40, 41

*Gillman v. Bally Manufacturing Corp.,* 670 A.2d 19 (N.J. App. Div. 1966) .............................. 39

*Jador Serv. Co. v. Werbel,* 53 A.2d 182 (E. & A. 1947) ........................................................ 20, 31

*Knollmeyer v. Rudco Indus., Inc.,* 154 N.J. Super. 309, 381 A.2d 378 (App. Div. 1977)       32

*Lehigh v. R. Co. v. Chapman,* 171 A.2d 653, 660 (N.J. 1961) .............................................. 32, 38

*Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,*
140 N.J. 366, 378, 658 A.2d 1230 (1995) ................................................................................. 3

*Mellon Bank v. United Bank Corp.,* 31 F.3d 113, 115 (2d Cir. 1994)........................................... 2

*MetLife Capital Fin. Corp. v. Wash. Ave. Assocs.,* 732 A.2d 496 (N.J. 1999)........... 29, 30, 33, 34

*Monmouth Lumber Co. v. Indemnity Ins. Co.,* 122 A.2d 604 (N.J. 1956)............................. 20, 31

*Naporano Associates, L.P. v. B & P Builders,* 706 A.2d 1123, 1128 (N.J. Super. 1998). .......... 34

*Rankin v. Homestead Golf & Country Club,* Inc., 37 A.2d 640 (N.J. Ch.1944)......................... 31

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,*
7 F.3d 1091, 1094 (2d Cir. 1993) ........................................................................................ 2, 3

*Schettino v. Roizman Dev. Inc.,* 730 A.2d 797, 802-803 (N.J. 1999).................................... 28, 29

*Schnakenberg v. Gibraltar Sav. & Loan Ass'n,* 117 A.2d 191 (App.Div.1955).......................... 28

*Selective Ins. Co. of America v. Hudson E. Pain Mgmt. Osteopathic Med.*,
   210 N.J. 597, 604, 46 A.3d 1272 (2012) ................................................ 3

*Truck Rent-A-Center v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 421 (1977).......................... 44

*Vanderbeek v. Barefoot*, 226 F. App'x 209, 214 (3d Cir. N.J. 2007)........................................ 38

*Washington Const. Co. v. Spinella*, 84 A.2d 617, 619 (N.J. 1951).......... 10, 22, 23, 24, 25, 26, 27

*Wasserman's Inc. v. Middletown*, 645 A.2d 100,105 (N.J. 1994) ................................... 30, 33, 34

*Westmount Country Club v. Kameny*, 197 A.2d 379,382 (App.Div. 1964).......................... 28, 34

**Statutes**

11 U.S.C. § 365 ................................................................................................ 11, 17, 43

11 U.S.C. § 365(d)(4) ........................................................................................................ 8

11 U.S.C. § 365(d)(4)(B) .................................................................................................. 8

28 U.S.C. § 1291 ............................................................................................................... 1

28 U.S.C. § 1334 ............................................................................................................... 1

28 U.S.C. § 157(b) ............................................................................................................ 1

28 U.S.C. § 158(a)(1) ........................................................................................................ 1

N.J.S.A. 12A:2-718 .......................................................................................................... 34

**Rules**

Fed. R. App. P. 4(a) ........................................................................................................... 1

Fed. R. App. P. 26.1 ........................................................................................................... i

Fed. R. Civ. P. 52(a) .......................................................................................................... 3

**Other Authorities**

9 Williston on Contracts (Rev. ed.), sec. 46, p. 64 ...................................................... 22

25 C.J.S. Damages §2 (1966)......................................................................................... 28

Black's Law Dictionary 3 (9th ed. 2009)..................................................................... 25

C. Wright & A. Miller, 9 FEDERAL PRACTICE
   AND PROCEDURE § 2588 at 750-51 (1971) .......................................................... 3

*Kenneth W. Clarkson, et al., Liquidated Damages v. Penalties: Sense or Nonsense?,*
   1978 Wisc. L. Rev. 351 ............................................................................................ 30

Restatement (Second) of Contracts §356(1) (1981) .................................................. 34

UCC § 2-718 ............................................................................................................... 34

## STATEMENT OF JURISDICTION

This case arises out of a Complaint filed by Plaintiff-Appellant N Providence, LLC's (hereafter "NP") in the Bankruptcy Court of the Southern District of New York in an Adversary Proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b). (Joint Appendix ("JA") 453-463). The Bankruptcy Court issued its final order on June 21, 2013. (Special Appendix ("SPA") 4-6).

The District Court (Cathy Seibel, U.S.D.J.) had subject matter jurisdiction over this civil case pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final judgments, orders, and decrees of a bankruptcy court. The District Court issued a final decision on April 28, 2014, affirming the Bankruptcy Court's final order. (SPA7-25). Judgment entered the same day. (JA452). NP timely appealed from that decision on May 14, 2014, pursuant to Fed. R. App. P. 4(a). (JA799).

The U.S. Court of Appeals for the Second Circuit has jurisdiction over this matter pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   Did the District Court err in affirming that The Great Atlantic & Pacific Tea Company, Inc. ("A&P") was entitled to summary judgment when it found that A&P was permitted to withhold all Rent and Charges for the entire Payment Default Period without crediting them against the Construction Allowance?

2.   Did the District Court err in affirming that Section 7G constituted an enforceable forfeiture clause under New Jersey law?

3.   Did the District Court err in affirming that A&P could withhold the Third Quarter 2011 real estate taxes invoiced under the Lease after NP cured the default?

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment on a contract dispute *de novo* and "employ[s] the same tests as those applied at the district court." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993).  "Summary judgment is only proper in contract disputes if the language of the contract is wholly unambiguous." *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir. 1994)(internal quotations omitted). Ascertaining whether the language of a contract is clear or ambiguous is a question of law to be decided by the court. *Mellon Bank*, 31 F.3d at 115. Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . . ." *Sayers*, 7 F.3d at 1095 (internal quotations omitted).

2

Accordingly, the Court will undertake a de novo and plenary review of the trial judge's application of the law, mindful that the judge's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Selective Ins. Co. of America v. Hudson E. Pain Mgmt. Osteopathic Med.*, 210 N.J. 597, 604, 46 A.3d 1272 (2012)(quoting *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 N.J. 366, 378, 658 A.2d 1230 (1995)). No ambiguity exists, however, "when contract language has a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Id.* (internal quotations omitted).

Under Rule 52(a) of the Federal Rules of Civil Procedure, this Court is bound by the factual findings of the district judge unless they are clearly erroneous. And if the district court's interpretation of the contract involves a question of law and is fully reviewable, to the extent that the interpretation depends upon extrinsic facts, this Court is bound by the findings of the lower court with respect to such facts. *See generally* C. Wright & A. Miller, 9 FEDERAL PRACTICE AND PROCEDURE § 2588 at 750-51 (1971).

3

## STATEMENT OF THE CASE

This is a civil appeal from a final judgment (JA777) of the United States District Court for the Southern District of New York (Cathy Seibel, U.S.D.J.) affirming the Southern District of New York Bankruptcy Court's grant of Summary Judgment for the Appellee-Defendant A&P.[1]

This appeal is ultimately about the consequences arising out of a breach of contract (the nine month delay by NP in paying a Construction Allowance due under the Lease on December 23, 2010) and the remedy that A&P is entitled to under New Jersey law to compensate for that breach. During the period of breach through the date the Construction Allowance was paid, A&P withheld all Rent and Charges which were due under the Lease totaling $949,875.03.[2] At the heart of this dispute is a basic contract construction issue, decided by the Bankruptcy Court as a matter of law against NP and affirmed by the District Court; that is, whether or not all Rent and Charges withheld by A&P until NP paid the $1.9 Million Construction Allowance, plus interest, should be treated as a credit against the Construction Allowance and interest due thereon. As Appellant argues below, the Bankruptcy Court was clearly in err – as was the District Court – as a matter of law, in finding that A&P could withhold Rent and Charges during this period

---

[1] See Opinion and Order of the Honorable Cathy Seibel, dated April 28, 2014 (SPA7-25).

[2] As discussed in Point 3 *infra*, the Q3-2011 Taxes were in fact payable <u>after</u> the default was cured. Despite this fact, the District Court affirmed that these taxes were part of the Abatement amount. Thus, the total referred to here includes those taxes.

without then crediting those amounts to the Construction Allowance, plus interest, despite the clear unambiguous language of Section 27 of the Lease. (SPA2, SPA8).

Furthermore, the District Court erred in affirming the Bankruptcy Court's finding that the Third Quarter 2011 real estate taxes ("Q3 2011 Taxes") constituted a Charge under the Lease which could be withheld even though these were due after NP cured the default. (SPA8, 23-24).

## STATEMENT OF RELEVANT FACTS

### A. The Lease and Amended Lease

On June 26, 2007, NP and A&P entered into a 20-year lease ("Original Lease") to lease 45,540 square feet of space in the Village Shopping Center located at 1260 Springfield Avenue in New Providence, New Jersey (the "Property"), on which A&P was to construct a new store. (JA32-110). Almost immediately after signing, A&P failed to perform under the Original Lease, specifically, to begin construction and refused to pay rent. (JA16-18). This resulted in protracted litigation between NP and A&P, which ultimately resulted in a settlement that was embodied in the First Amendment of Lease (the "Amendment") on October 23, 2009 (JA111-126) (hereafter "Original Lease" and "Amendment" are collectively referred to as the "Lease"). Pursuant to the Amendment, NP agreed to pay a reduced Construction Allowance in the amount of $1.9 Million Dollars on or before the 90th day following the date that A&P opened its store. (JA116).

After the execution of the Amendment, NP began seeking financing for the payment of the Construction Allowance. (JA19-20). In the middle of 2010, after the Amendment was entered into by the Parties, the original lender to the Property, Sovereign Bank, was approached by NP for refinancing of the mortgage loan. (JA12). Sovereign Bank expressed concerns about refinancing the loan due to A&P's economic viability and the impact of the Amendment in the event A&P

6

were to file for bankruptcy. *Id*. A preliminary term sheet was issued for a loan to NP, however upon additional negative news being disclosed, Sovereign Bank rejected the loan. (JA13). Thereafter, alternative lenders were sought out but all lenders declined to issue the requested loan due to A&P's credit risk. *Id*. Up to and continuing through the fall of 2010, NP continued to seek a lender to refinance the Property and fund the Construction Allowance. *Id.*

On September 24, 2010, almost one year after the Amendment was signed, A&P opened its store on the Property. (JA453-462). Thus, the 90-day time frame for the Construction Allowance to be paid by NP commenced on September 24, 2010, and was set to expire on December 23, 2010. *Id*. Based upon the grand opening, UBS determined that although A&P continued to be a credit risk, it would extend NP such financing as a result of the grand-opening and the likelihood that A&P would continue to occupy the Property. (JA13). On October 22, 2010 UBS issued a loan commitment in the amount of $19,200,000. *Id*. NP paid a deposit of $75,000 for the commitment, and expended at least $100,000 in legal fees and due diligence costs in connection with the future closing of the UBS loan. *Id; (see also* JA459). The Lender and NP established a target closing date of December 16, 2010, several days before the Construction Allowance was due, which would be paid from the loan closing proceeds. (JA14; JA459).

**B. A&P Files Bankruptcy**

On December 12, 2010, four days prior to NP's projected closing with UBS, A&P filed a petition for relief under Chapter 11 of the Bankruptcy Code ("Petition Date").[3] (JA3). Thereafter, UBS immediately informed NP that it was fully prepared to proceed with the closing of the loan as soon as A&P assumed the Lease because it had determined that without assumption A&P would not remain at the Property. (JA14). Pursuant to the 11 U.S.C. § 365(d)(4), A&P was permitted an initial period of 120 days from the Petition Date to assume or reject the Lease. On January 18, 2011, pursuant to 11 U.S.C. § 365(d)(4)(B), A&P moved for an additional 90 days to assume or reject the unexpired leases of non-residential property. (JA4). NP filed an objection to A&P's motion on January 25, 2011, along with a motion seeking payment of Rent. (JA4). During this period, A&P withheld all Rent and Charges due under the Lease as it was their position they were entitled to do so until the Construction Allowance was paid, citing Section 7G of the Lease, despite the fact that NP was unable to finance the Construction Allowance due to A&P's bankruptcy filing and unwillingness to assume the Lease. (JA454-455). It was NP's position that A&P was entitled to

---

[3] A&P was fully aware that NP was closing the loan as NP was required to "deliver to [A&P] evidence that [NP] had (i) either closed its financing or has an irrevocable commitment for financing in an amount sufficient to enable [NP] to pay to {A&P} the Construction Allowance and complete [A&P's] Work, and (ii) has an irrevocable commitment for its permanent financing." (JA49-50). A&P had to also produce an estoppel certificate to NP for the loan closing. (JA176).

offset its rent as provided by Section 27A of the Lease. *Id.* Specifically, Section 7G of the Amendment provides as follows:

7.    CONSTRUCTION

G.    [NP] shall pay to [A&P] on or before the date that is the earlier of (i) ninety (90) days following the date of opening, or (ii) the date of [NP's] closing on its permanent financing (but in no event prior to the Opening), a construction allowance for the completion of [A&P's] Work (including all so-called 'hard costs' and 'soft costs' incurred in connection with the performance of [A&P's] Work, including without limitation, any site work and compaction of the pad for [A&P's] Building, and in negotiating and entering into this Lease) in the amount of One Million Nine Hundred Thousand and 00/100 ($1,900,000) Dollars (hereinafter called the "Construction Allowance"). [ ] If [NP] fails to pay to [A&P] the sum owed to [A&P] hereunder within ten (10) days of the receipt and provision of a copy to [NP] of a certificate of occupancy, then [A&P's] obligation to pay fixed annual rent and Charges shall abate effective as of the day after the due date of [NP's] payment of the Construction Allowance without any obligation of [A&P] to give [NP] further notice, until [A&P's] receipt of the Construction Allowance, together with interest on the unpaid balance thereof at the Lease Interest Rate (as hereafter defined) from the due date until [A&P's] receipt of same. [A&P] shall have title to the [A&P's] Building and all other Improvements constructed by [A&P] on the Demised Premises and [A&P] shall be entitled to the benefits of ownership thereof, including, but not limited to, depreciation of same as an asset for taxing purposes, until such time as [A&P] shall have been fully reimbursed the Construction Allowance at which time title to [A&P's] Building and other Improvements on the Demised Premises shall revert to [NP].

(JA116; JA47-48).

Section 27A titled "Landlord's Default", included in the Original Lease, and unchanged by the Amendment, specifically detailed the remedies and procedures

9

to be applied should NP default under the Lease.  (JA69-70). That section provides:

> 27.  LANDLORD'S DEFAULT
>
> A.    If [NP] shall be in default hereunder, [A&P] may (i) after thirty (30) days notice that [NP] is in default in the payment of ***any monies*** which [NP] is obligated to pay to [A&P] pursuant to the terms of this Lease, deduct the amount thereof plus interest on the outstanding balance from time to time at the greater of (1) interest at the Prime Rate (as hereafter defined) per annum plus two (2%) percent per annum, or (2) nine (9%) percent per annum, or if such rate is illegal, at the highest rate permitted by law (hereinafter called the "Lease Interest Rate") from fixed annual rent and/or Charges or (ii)….

*Id*. (*emphasis added*).  This section very clearly states that it applies to any default under the Lease.  That would include by the plain meaning a breach under Section 7.  Further, it specifically refers to a failure of NP to pay "any monies" owed to A&P, which is notable because Section 7 is the only section of the Lease in which NP is required to pay A&P money.  *Id*. Nonetheless, the Bankruptcy Court held, and the District Court affirmed, that Section 27 did not apply to Section 7.[4] (JA526-532; JA788-792).   This is especially puzzling when the both courts proceeded to calculate the interest rate, as defined in Section 27, to determine the interest to be awarded to A&P under Section 7, apparently picking and choosing which portions of Section 27 would apply to Section 7.  (JA526-536; AJ791).

---

[4] As will be discussed *infra*, the basic tenants for contract construction are to consider the contract "as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions." *Washington Const. Co. v. Spinella*, 84 A.2d 617, 619 (N.J. 1951).

The Bankruptcy Court held an evidentiary hearing on March 3, 2011 to determine whether NP would be damaged beyond compensation available under the Bankruptcy Code if A&P continued to occupy the Property without assuming the Lease. (JA156-295). The Bankruptcy Court acknowledged on March 18, 2011 the difficulties NP had in obtaining financing to fund the Construction Allowance, however based upon a balancing of harms analysis, the Bankruptcy Court determined that A&P's burden to prematurely assume or reject the Lease was of greater concern than NP's compensable damages available under the Bankruptcy Code. (AJ305-306; 310; 317-319). As such, the Bankruptcy Court granted A&P's motion for additional time to assume or reject the Lease until July 10, 2011. (JA325-327). The Bankruptcy Court expressly declined to rule on whether the Lease allowed "an abatement or an offset" with respect to NP's failure to pay the Construction Allowance. (JA319-320). Thereafter, on June 22, 2011, A&P filed a motion to assume certain unexpired leases pursuant to §365, which included the Lease with NP. (JA8). The Court granted A&P's Motion, and entered an Order on July 8, 2011 which provided that the effective date of the lease Assumption would be the date of the Order. (JA339-343). After this assumption, NP was finally able to begin working with UBS to complete the closing on the Property and fund the Construction Allowance.[5] (JA540).

---

[5] NP paid more than an additional $100,000 in connection with the UBS closing beyond the

11

## C. Third Quarter Real Estate Taxes

Prior to A&P filing its Petition for Chapter 11, the Fourth Quarter 2010 real estate taxes ("Q4 2010 Taxes") for the Property became due and NP issued an invoice[6] as provided in Exhibit G of the Lease, which provides as follows:

> For each Tax Year Tenant shall pay to Landlord, in the manner hereinafter provided, Tenant's Proportionate Share of Real Estate Taxes. Tenant's Proportionate Share of said Real Estate Taxes shall be due and payable by Tenant thirty (30) days after receipt by Tenant of a receipted tax bill or tax bills indicating thereon the Real Estate Taxes assessed against the Shopping Center for the applicable Tax Year and quarter and a statement setting forth, in detail, the calculation of Tenant's Proportionate Share of Real Estate Taxes.

(JA99).  The payment for the Q4 2010 Taxes was not paid until June 2013, when NP was ordered by the Bankruptcy Court to do so as these costs arose pre-Petition. (SPA4-6).   During the pending of the Adversary Proceeding filed by NP, as discussed below, the Third Quarter[7] 2011 real estate taxes ("3Q 2011 Taxes") came due.   (JA681-682).   NP issued payment to the Borough (JA683), and thereafter, on August 24, 2011, NP issued an original invoice to A&P as required. (JA693-694).  In response, on October 13, 2011, A&P sought a revised invoice due to an apparent allocation error.   (JA554-556).   NP corrected and issued a final

---

expenses previously incurred with the projected December 16, 2010 closing.
[6] (AJ674-680).
[7] Third Quarter reflects the months of July, August and September of each year.

invoice on October 13, 2011, after NP had cured the default with respect to the Construction Allowance. (JA557).

## D. The Proceedings Below

On June 28, 2011, NP commenced an adversary proceeding by filing the Adversary Complaint, seeking a declaration of the meaning and effect of the word "abate" in Section 7G of the Lease and monetary relief in the form of a credit or reduction from the Construction Allowance to be paid by NP to A&P pursuant to Sections 7G and 27 of the Lease. (JA453-463). It has always been NP's position that these two sections must be read together, as they contain cross-references that clearly contemplate that the word "abate" as referenced in Section 7G be deemed a credit against any NP Lease payment obligations. (JA455). Furthermore, the remedies to occur if and upon NP was to breach the Lease are found within this Section. (JA69-70).

On July 28, 2011, A&P moved to dismiss Count Two of NP's Adversary Complaint, answered and moved for judgment on the pleadings on Count One, and asserted a claim for declaratory relief. (JA464-475). Thereafter, on August 9, 2011, NP answered A&P's counterclaim, opposed A&P's motion for judgment on the pleadings, and moved for summary judgment on Count One of its Adversary Complaint. (JA476-479). On September 9, 2011, A&P opposed NP's motion for

summary judgment and moved for judgment on the pleadings on its counterclaim. (JA446).

Oral arguments were held regarding these motions on September 26, 2011. (JA486-538). At that hearing, the Bankruptcy Court requested supplemental briefing on the limited issue of the enforceability of liquidated damage provisions under New Jersey law. (JA537). Immediately following this hearing, and without prejudice to its rights in the matters ruled upon that day by the Court, NP secured the interim financing and paid the full amount of the Construction Allowance ($1,900,000) as well as the 9% per annum Lease Interest Rate as prescribed in Section 27 of the Lease, for a total amount of $2,034,671 which included over $134,000 of interest to compensate A&P for the nine month delay in payment of the Construction Allowance. (JA540). A bench ruling was issued January 24, 2012 wherein the Bankruptcy Court held that A&P was permitted to withhold all Rent and Charges for the entire period during which NP was in default on its obligation to pay the $1.9 million Construction Allowance, plus interest, under the Lease; however, the Court reserved ruling and sought more evidence on whether the amount that A&P withheld under Section 7G constitutes, in whole or in part, an unenforceable penalty or whether it constitutes reasonable damages for NP's breach. (JA526-532; SPA1-3). The Bankruptcy Court denied

with prejudice NP's contention that the rent abatement was subject to an offset or reimbursement.  (SPA1-3).

Discovery commenced between the parties during which A&P admitted that from December 23, 2010 to October 1, 2011, there was always a minimum of $2.1 million in undrawn credit available under its DIP Facility and the rate of interest actually paid by A&P to JP Morgan during this time period (on the outstanding balance on the Revolving Loan Portion of the Debtor in Possession Credit Facility) was less than 9% per annum.  (JA575-580).  On October 16, 2012, NP moved for summary judgment seeking a determination as a matter of law that Section 7G of the Lease is a punishment provision, not compensation, and assessing that under the totality of the circumstances, Section 7G does not bear a reasonable relationship to Debtor's actual damages and is thus an unenforceable penalty.  (JA448).  A&P opposed the motion arguing that it was not an unenforceable penalty but rather a valid forfeiture under New Jersey law, and even if considered a liquidated damages clause, that it was reasonable, thereby precluding summary judgment for NP.  *Id*.  During oral argument, the Bankruptcy Court again requested supplemental briefing on the "forfeiture issue" as it did not believe the clause fit easily into the liquidated damages rubric because the parties did not denominate the provision as such. (JA659-667).  The Bankruptcy Court denied summary judgment to NP, holding that questions of fact remained.

(JA666).  The Court granted A&P leave to move for summary judgment on Count One of the Adversary Proceeding based on the contention that Section 7G of the Lease is an enforceable "forfeiture" clause. (JA669).

A&P filed its Motion for Summary Judgment on January 17, 2013, positing that in addition to receiving more than $134,600 in interest, it was entitled to a windfall of an additional $949,875.03 of free "Rent and Charges" for the default period because Section 7G is a valid forfeiture clause, not a penalty or liquidated damages clause. (JA449).  NP argued that Section 7G creates an unenforceable penalty provision under New Jersey law – not an enforceable forfeiture clause – asking the Bankruptcy Court to enter an order directing the immediate payment of not only the $883,205.68 in withheld Rent, but also the $72,960.57[8] needed to cure A&P's existing default regarding real estate tax reimbursements.  *Id*.  Oral argument was held on April 30, 2013, at which time the Bankruptcy Court sought additional briefing related to A&P's default with respect to real estate tax payments due under the Lease.  (JA765).

After supplemental briefing, the Bankruptcy Court issued a final order on June 21, 2013, granting A&P's January 17, 2013 summary judgment motion and denying NP's October 16, 2012 motion for summary judgment, holding that A&P

---

[8] This amount consisted of taxes that were outstanding for Q4 2010 Real Estate Taxes as well as the Q3 2011 Real Estate Taxes.

was not liable for Rent or Charges under the Lease pursuant to Section 7G during the period that NP was in breach of its obligation to pay the Construction Allowance and interest thereon. (SPA4-6). The Bankruptcy Court also ruled that NP did not timely assert a cure claim under 11 U.S.C. § 365 with respect to the Third Quarter 2011 real estate taxes ("Q3 2011 Taxes") owing in the amount of $66,669.35, and thus waived such claim. (SPA5). Additionally, the Bankruptcy Court held that even if the Q3 2011 Taxes were due as a "Charge" pursuant to the Lease, even if this claim had not been waived, this obligation was abated pursuant to Section 7G. *Id.* Finally, the Bankruptcy Court ordered A&P to pay the sum of $6,291.22 in unpaid Q4 2010 Taxes which were due prior to the Petition Date. *Id.*

## E. The District Court's Decision

On July 2, 2013, NP filed a timely Notice of Appeal. (JA778-779). On appeal, NP argued that the Bankruptcy Court erred in granting summary judgment to A&P when it permitted A&P to withhold all Rent and Charges for nine months without crediting NP against the Construction Allowance as expressly provided in Section 27 of the Lease. (SPA14). NP also argued that the Bankruptcy Court erred in finding that Section 7G of the Lease – as incorrectly interpreted – was an enforceable forfeiture under New Jersey law, when in reality the clause was a penalty intended to secure performance and compensation. *Id.* As such, the District Court was clearly erroneous in holding that the clause should not be

17

enforced due to the unconscionable or unreasonable nature of it. _Id_. NP also challenged the Bankruptcy Court's finding that NP waived its claim to Q3 2011 taxes under the Lease because it did not timely assert a cure claim, when none existed. _Id_. Finally, NP asserted that the Bankruptcy Court erred in finding that A&P could withhold the Q3 2011 Taxes under the Lease as these taxes were due and owing after NP had already paid the Construction Allowance, plus interest. _Id_.

Notwithstanding NP's largely undisputed evidence to support the assertions that A&P was adequately compensated for NP's breach by the "Lease Interest" and to hold otherwise would be a punishment, the District Court issued its final Order on April 28, 2014 rejecting all of NP's arguments. (SPA7-25). The District Court affirmed that A&P "was not liable for payments during the period when NP was in breach, including payments of taxes for the third quarter of 2011." (SPA8).

## SUMMARY OF ARGUMENT

The central question in this Appeal is whether Section 7G allowed A&P to never pay any Rent and Charges for the entire period during which NP delayed in paying the Construction Allowance, plus interest, under the Lease, rather than allowing NP a credit for those withheld payments against the Construction Allowance as clearly required by Section 27 of the Lease.  The consequence of NP's breach in paying the Construction Allowance nine months late can be summarized as follows:  Because the Construction Allowance was not paid on December 23, 2010 due to A&P filing a bankruptcy petition four days before NP's scheduled financing closing, NP could not pay the Construction Allowance because UBS refused to fund it until A&P assumed the Lease, and A&P presumably had to borrow the $1,900,000 on its revolving DIP facility – paying less than 9% interest on that amount.  Nine months later, after the Lease was assumed, NP paid the $1,900,000 Construction Allowance in full, plus $134,600 in interest, which was available for A&P to pay down the entire $1,900,000 it had to borrow on December 23, 2010, plus any accrued interest thereon at less than 9%. In short, there is no dispute that A&P made a profit on the delay.

A&P paid no Rent or Charges during this period, arguing that NP's breach created a forfeiture.  Under the Bankruptcy Court's ruling and the District Court affirmation, A&P received $949,875.03 in free Rent and Charges for NP's delay,

19

plus $134,600 in interest. To allow A&P a windfall of over $1 million dollars would be unconscionable and against public policy and would render Section 7G an unenforceable penalty provision under New Jersey law. A&P argues that such windfall is a valid forfeiture, despite the fact that A&P enjoyed over $73,000 in sales per day during the first 129 days of operations, while sustaining no actual damages due to the payment delay. Controlling New Jersey law holds that a "forfeiture" is in the nature of a penalty for the doing or the failure to do a particular thing, and because the law abhors a forfeiture, particularly with respect to one who is a wrongdoer, a court will not lend its aid to enforce one. See *Jador Serv. Co. v. Werbel*, 53 A.2d 182 (E. & A. 1947) (emphasis added); *See also Monmouth Lumber Co. v. Indemnity Ins. Co.*, 122 A.2d 604 (N.J. 1956).

Accordingly, this Court should overturn the District Court's determination that Section 7G is a valid forfeiture, and find that Section 7G is an unenforceable penalty because A&P suffered no actual damages and it cannot receive a windfall of $949,875.03 after it was fully compensated for the delay by the payment of interest.

20

# ARGUMENT

## I.   THE DISTRICT COURT ERRED IN AFFIRMING THAT A&P WAS PERMITTED TO WITHHOLD ALL RENT AND CHARGES FOR THE ENTIRE PAYMENT DEFAULT PERIOD WITHOUT CREDITING THEM AGAINST THE CONSTRUCTION ALLOWANCE.

The District Court's finding that NP was not entitled to a credit against the Construction Allowance for the Rent and Charges withheld by A&P was clearly in error, as the plain language of the Lease as a whole provides for such an offset. There is no ambiguity in Sections 7 and 27A of the Lease, which clearly provides that any rent withheld by A&P be offset against any Construction Allowance due. Furthermore, an ambiguity in the terms of the Lease did exist, an offset must be allowed so as to avoid a windfall of almost $1M dollars for A&P, which would be both inequitable, and well outside the scope of what both parties intended when entering into this Lease.

Under New Jersey Law, Courts must enforce a contract "based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." <u>Caruso v. Ravenswood Developers, Inc.</u>, 767 A.2d 979 (App. Div. 2001).  It is well established under New Jersey Law that:

> Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent. A contract must be considered as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions.  The individual clauses and particular words must be considered in connection with the rest of the agreement, and all

21

parts of the writing and every word of it, will, if possible, be given effect. The words of contracts should be given a reasonable meaning rather than an unreasonable one and a court will endeavor to give a construction most equitable to the parties and which will not give one of them an unfair or unreasonable advantage over the other.

*Washington Const. Co. v. Spinella*, 84 A.2d 617, 619 (N.J. 1951) (citing 9

Williston on Contracts (Rev. ed.), sec. 46, p. 64) (emphasis added).

*Washington Const. Co*. involved a dispute between a building owner and a contractor arising out of a construction contract which the building owner had cancelled prior to the building's completion. *Id*. at 617. Pursuant to the contract, the contractor was entitled to receive a fee upon cancellation before completion, to be calculated as 10% of the "cost of construction and labor up to that date." *Id*. at 618. The contractor argued that the "cost of construction" included the cost of any unused materials that he had already obtained for the building owner, while the building owner argued that "cost of construction" should be interpreted literally to mean only the costs of those portions of construction that had been completed. *Id*. In interpreting this phrase, the court looked at the contract ***as a whole***, finding that other sections provided that the contractor was responsible for finding materials for the construction, and that under this other section such costs would have been included in the builder's determination of his compensation. *Id*. (emphasis added). The court also noted that, under the building owner's interpretation of the contract, this would allow him to secure the contractor's work in obtaining these materials

22

for free. The court held that "[i]n the absence of a *specific expression* to that end, it cannot be held that the rendering of such valuable services was intended to be gratuitous." *Id.* at 620 (emphasis added).

Here, A&P argues, and the District Court found, that A&P is entitled to free rent for nine months, in addition to a full Construction Allowance, with interest, based solely on the use of the word "abate" in Section 7G of the Lease. This interpretation is in direct opposition to the rule established in *Washington Const. Co.*, as it looks only at one detached portion of the contract and places far too much importance on the use of this particular word, while completely ignoring the remainder of the Lease (and specifically Section 27 that dealt with landlord payment defaults) and the clear intent of the parties expressed therein.

The Parties do not dispute that Section 7G of the Lease requires NP to pay A&P its Construction Allowance within 90 days of the Property's grand opening. What is disputed is the remedy to which A&P was entitled when NP failed to pay the Construction Allowance within this 90-day period. This dispute is unnecessary, however, as the Lease when read as a whole, clearly provides in Section 27 a remedy in such a situation – A&P may withhold rent until the Construction Allowance is paid, with interest; any such withheld rent is subsequently to be offset and deducted from the Construction Allowance owed by NP.

Section 7G states only that A&P shall have the right to "abate" rent in the event of NP's default; it does not provide any definition for the term "abate" nor does it provide any further guidance regarding how this clause shall be enforced. Another section of the lease, however, does provide the specific procedure to be followed in the event of NP's default under the lease: Section 27A, which is conspicuously titled "Landlord's Default." This section begins "If [NP] shall be in default hereunder, [A&P] may…" and then provides in detail the remedies to which A&P is entitled. The language of Section 27A provides in pertinent part that:

> If [NP] shall be in default hereunder, [A&P] may (i) after thirty (30) days notice that [NP] is in default in the payment of any monies which [NP] is obligated to pay to [A&P] pursuant to the terms of this Lease, deduct the amount thereof plus interest on the outstanding balance from time to time at the greater of (1) interest at the Prime Rate (as hereafter defined) per annum plus two (2%) percent per annum, or (2) nine (9%) percent per annum, or if such rate is illegal, at the highest rate permitted by law (hereinafter called the "Lease Interest Rate") from fixed annual rent and/or Charges . . . .

(JA69).

If one were to look only to the language of Section 7G, detached from the remainder of the Lease, then the interpretation set forth by A&P may be plausible. New Jersey law dictates, however, that "[a] contract must be considered as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions." _Washington Const. Co._, 84 A.2d at 619. When looking at

this Lease as a whole, it is clear that Section 27A was intended to be applied *whenever* there was a default by NP under the Lease. This section specifically states that it is to be applied to "any default hereunder" with no qualifications. (JA69). Furthermore, this section of the Lease specifically refers to Section 7G, further evidencing the parties' intent that these sections were to be read together.[9] *Id.* Here, the intention of the parties is clear; if the parties intended to exclude Section 7G from the Section 27 remedies they could and should have done so.

Nonetheless, the District Court chose, contrary to New Jersey law, to focus its entire analysis below on the use of the term "abate" in Section 7G. Even assuming that such reliance is permissible under New Jersey law (which it is not), the District Court's logic was still flawed.

First, the term "abate", which is not defined in the Lease, is indeed capable of various interpretations. The District Court stated that "the Term 'abatement' is defined as 'the act of eliminating or nullifying'." (SPA16). The District Court failed to acknowledge, however, that the term has several definitions, and can also mean simply "the act of lessening or moderating; diminution in amount or degree." Black's Law Dictionary 3 (9th ed. 2009). Thus, the use of this term, without more,

---

[9] Also significant, the term "Lease Interest Rate", on which the Bankruptcy Court relied to determine the amount of interest due is only defined in Section 27.

25

cannot be a sufficient justification for allowing A&P to withhold all Rent and Charges without a credit against the Construction Allowance.

Second, the District Court placed great weight on the use of the term "abate" versus the terms "offset, recoupment, withholding or deduction." (SPA17). The District Court failed to recognize, however, that the term "abate" is used, not only in Section 7G, but in several other Sections. In fact, it is the only term used in the Lease to describe A&P's right to withhold rent for any reason. While the terms "offset, recoupment and withhold" are in fact used in Section 7, they are only used to refer to the "recoupment" of any costs advanced by A&P; they are not used in any section to refer to A&P's right to withhold rent. As such, it is clear that "abate" was intended only as a generic term to refer to the "withholding" of rent.

Furthermore, New Jersey law also requires that, when interpreting a contract, "all parts of the writing and every word of it, will, if possible, be given effect." *Washington Const. Co.*, 84 A.2d at 619. As "abate" is the only term used in the Lease to refer to withholding of rent, following the District Court's logic this would mean that every time that A&P were entitled to withhold rent, it would be able to do so without any setoff or recoupment by NP. This would, in essence, eliminate the entire purpose of the procedures set forth in Section 27A of the Lease, which is clearly in conflict with the parties' intent, and goes against the rules of contract interpretation of the State of New Jersey. *Id.*

Finally, to interpret the Lease in the manner set forth by A&P provides them with a windfall of $949,875.03, a result that is not permissible under New Jersey Law, and is well outside what the parties intended. Without setoff A&P will be allowed to keep the Construction Allowance, plus interest, along with all Rent and Charges that were due for the time period that the Construction Allowance was not paid, totaling $949,875.03. This is in spite of the fact that A&P had full use of the building for this entire period.

As the court in *Washington Const. Co.* explained, "[i]n the absence of a *specific expression* to that end, it cannot be held that the rendering of [] valuable services was intended to be gratuitous." *Washington Const. Co.*, 84 A.2d at 620 (emphasis added). If the contractual interpretation proposed by A&P is allowed, it would be able to obtain something very valuable, occupancy of a large commercial unit, for free. There is no language in the lease that even intimates to such an outcome, let alone "specifically expresses it." It is worth noting that the District Court reasoned that "the Lease contemplates such an outcome" but the Court fails to point to any explicit language in the Lease to support this conclusion. (SPA19).

It is respectfully submitted that this Court should therefore reverse the lower courts and interpret Section 27 with Section 7G to implement the clear purpose of both sections. Under the clear provisions of Section 27, the Rent and Charges that

27

were withheld by A&P must be viewed as a credit against the Construction

Allowance and interest.

## II.    THE DISTRICT COURT ERRED IN FINDING SECTION 7G AN ENFORCEABLE FORFEITURE UNDER NEW JERSEY LAW.

Rather than following the basic tenant of contract law which is look to the

words used by the drafters, not in isolation, but as a whole, in order to ascertain

their meaning (*Schnakenberg v. Gibraltar Sav. & Loan Ass'n*, 117 A.2d 191

(App.Div.1955)), the District Court singled out Section 7G and erred in finding

that it was an enforceable forfeiture clause.  The District Court held that "[w]ith

respect to whether Section 7.G is a penalty, liquidated damages or forfeiture

provision", "Section 7.G is plainly inconsistent with the definition of a penalty or

liquidated damages clause under New Jersey law because the Section does not

provide for a specific sum to be paid in the event of breach."  (SPA20).  In relying

upon the definition set forth in *Westmount Country Club v. Kameny*, 197 A.2d

379,382 (App.Div. 1964), the District Court errs as the Supreme Court of New

Jersey has set forth that "liquidated damages are those the amount whereof has

been ascertained by judgment or by the specific agreement of the parties, **or which**

**are susceptible of being made certain by mathematical calculation from**

**known factors.**" *See Schettino v. Roizman Dev. Inc*., 730 A.2d 797, 802-803 (N.J.

1999)  emphasis  added  (quoting  25  C.J.S. Damages §2  (1966)); *Firefreeze*

*Worldwide, Inc. v. Brennan & Assocs*., 790 A.2d 238 (App. Div. 2002)

(holding that a claim for the unpaid balance of a contract for goods and a counterclaim for commissions under a written agreement both comprised claims for liquidated damages). This is in line with *MetLife Capital Fin. Corp. v. Wash. Ave. Assocs.*, 732 A.2d 496 (N.J. 1999), wherein the court considered whether the five percent late charge assessed against each delinquent payment, and the default rate of interest, constituted a reasonable stipulated damages provision in a commercial loan. The *MetLife* stipulated damages provision was not a "specific sum to be paid" as the District Court believes is required to fall within the provision of a stipulated damages provision. *Id.;* (SPA21). Rather, the *MetLife* stipulated damages provision was a claim that was "susceptible of being made certain by mathematical calculation from known factors." *Schettino*, 730 A.2d at 802-803. In failing to acknowledge that Section 7.G is a provision that is "susceptible of being made certain by mathematical calculation from known factors", the District Court erred in holding that because "the abated rent and Charges will vary" Section 7G is not a liquidated damages provision but a forfeiture provision. *Id.;* (SPA21). Applying the correct definition of liquidated damages to this matter, the nine month delay in A&P withholding rent is calculated at $949,875.03, based upon the Lease in determining that $883,205 in Rent was owed for this period and $66,669.35 in Charges as it related to Q3 2011 Taxes.

Enforceable stipulated damages clauses are referred to as "liquidated damages," while unenforceable provisions are labeled "penalties." *Wasserman's Inc. v. Middletown*, 645 A.2d 100,105 (N.J. 1994) (quoting Kenneth W. Clarkson, et al., Liquidated Damages v. Penalties: Sense or Nonsense?, 1978 Wisc. L. Rev. 351, 351 n.1). The validity of a stipulated damage clause depends on whether a court interprets the clause as an unenforceable penalty or as an enforceable provision for liquidated damages. A stipulated damage clause must constitute a reasonable forecast of the provable injury resulting from a breach, otherwise the clause will be unenforceable as a penalty and the non-breaching party will be limited to conventional damages. Enforceability is to be determined at the time of contract or when the contract is breached. A stipulated damage provision, if found in a commercial contract between sophisticated parties is presumptively reasonable, and the party challenging the clause bears the burden of proving its unreasonableness. *MetLife Capital Fin. Corp.*, 732 A.2d at 498.

The Supreme Court of New Jersey has set forth that the validity of a liquidated damages clause turns on reasonableness and is affected by "the difficulty in assessing damages, intention of the parties, the actual damages sustained, and the bargaining power of the parties." *Id.* at 495 (citations and internal quotation marks omitted). NP challenges the District Court affirming that the Rent and

30

Charges withheld by A&P were a forfeiture of rent because Section 7G constitutes an unconscionable penalty. The District Court failed in applying the appropriate standard to determine such finding as Section 7G does not bear a reasonable relationship to A&P's actual damages thus it is a penalty as A&P was adequately compensated for the breach from the interest calculated by Section 27.

### A.  Section 7G is a Stipulated Damages Clause that is an Unenforceable Penalty

Once the District Court erred in determining Section 7G was not a stipulated damages clause, but a forfeiture based upon an improper definition, the District Court failed to acknowledge the fact that controlling New Jersey law holds that a "forfeiture" is in the nature of a penalty for the doing or the failure to do a particular thing, and because the law abhors a forfeiture, courts will generally not lend aid to enforce one. *See Jador Serv. Co.,* 53 A.2d at 182; *See also Monmouth Lumber Co.,* 122 A.2d at 604. Although the District Court relies upon Black's Law Dictionary to set forth the definition of "forfeiture", it ignores the Supreme Court of New Jersey which held that:

> '* * * The common and general definition of the word 'forfeit' is 'lost by omission or negligence or misconduct.' It is in this general sense that the word 'forfeiture' is used when it is said that equity will not actively lend its aid to enforce a forfeiture or that equity will relieve against unjust forfeitures. A forfeiture is in the nature of a penalty for the doing or the failure to do a particular thing, e.g., using leased premises for a purpose prohibited by the lease, failing to pay rent, and the like. To incur a forfeiture is to fail to keep an obligation.'
> *Rankin v. Homestead Golf & Country Club, Inc.,* 37 A.2d 640, 643

(N.J. Ch.1944); *See also Jador Service Co. v. Werbel*, 53 A.2d 182 (N.J. E. & A. 1947).

*Lehigh v. R. Co. v. Chapman*, 171 A.2d 653, 660 (N.J. 1961) (*emphasis added*).

In relying solely upon *Dunkin Donuts of America, Inc. v Middletown Donut Corp.,* 495 A.2d 66 (N.J. 1985) to affirm the ruling of the Bankruptcy Court, the District Court clearly erred when holding that the enforceability of a forfeiture clause is not evaluated based upon a reasonableness standard, (SPA23) which is in direct contradiction to the Supreme Court of New Jersey and *Rosen* that held as follows:

> Our analysis reveals that the common thread woven throughout the decisions by these courts reviewing specific issues posed by challenges to the CAP and the New Jersey decisions permitting or prohibiting forfeiture is that **enforceability of a forfeiture provision is judged against the standard of reasonableness**, with due regard for the consideration that the court's equitable jurisdiction to permit relief from a forfeiture clause must not ignore the parties' legal rights to bind themselves to specific contract terms. *See Dunkin' Donuts of Am.,supra*, 100 N.J. at 182-86, 495 A.2d 66; *Gillman, supra*, 286 N.J. Super. at 530-33, 670 A.2d 19;*Knollmeyer v. Rudco Indus., Inc.*, 154 N.J. Super. 309, 313-14, 381 A.2d 378 (App. Div. 1977).

*Rosen v. Smith Barney, Inc.*, 393 N.J. Super. 578, 592, 925 A.2d 32, 41 (App.Div. 2007) (emphasis added). Similar to a liquidated damages analysis, all of the forfeiture cases turn on reasonableness and the 'totality of the circumstances' and rightfully should as a forfeiture is in the nature of a penalty. As such, even if the District Court was correct in its interpretation of Section 7G as a forfeiture

provision, it was incorrect in failing to judge Section 7G against the standard of reasonableness. *Id.*

**B.    Judged Against the Standard of Reasonableness, Section 7G of the Lease is a Punishment Provision, Thus it is Unconscionable and Not Enforceable**

Because Section 7G is a stipulated damages provision, not a forfeiture, three criteria have been identified by the Supreme Court of New Jersey for which to distinguish a valid liquidated damages clause from a penalty clause:

> (1) the injury caused by the breach must be difficult to estimate; (2) the parties must intend to provide for damages rather than a penalty; and (3) the sum stipulated must be a reasonable estimate of the probable loss or reasonably proportionate to the actual damage sustained at the time of the breach.

*Wasserman's Inc.*, 645 A.2d at 106; *see also Metlife*, 732 A.2d at 493.  In deciding the validity of stipulated damages clauses, "reasonableness" is the standard in New Jersey in that the clause "must constitute a reasonable forecast of the provable injury resulting from breach; otherwise, the clause will be unenforceable as a penalty and the non-breaching party will be limited to conventional damage measures."  *Wasserman's Inc.,* 645 A.2d at 105. Further, the modern trend of New Jersey courts is to consider "assessing reasonableness either at the time of contract formation or at the time of the breach." *Id.* at 106.  Similarly, the Uniform Commercial Code ("UCC") and the *Restatement (Second) of Contracts* both emphasize reasonableness as the

touchstone in determining enforceability of stipulated damages clauses. Section 2-718 of the UCC, adopted in New Jersey as N.J.S.A. 12A:2-718; and the Second Restatement of Contracts §356(1) (1981). Thus, although stipulated damages clauses are presumptively valid, they must be reasonable in light of the actual loss or harm caused by the breach.

"New Jersey courts have viewed enforceability of stipulated damages clauses as depending on whether the set amount "is a reasonable forecast of just compensation for the harm that is caused by the breach" and whether that harm "is incapable or very difficult of accurate estimate." *Wasserman's Inc.*, 645 A.2d at 105 *citing Westmount Country Club*, 197 A.2d at 382. As such, because such a clause may constitute an oppressive penalty and may be unenforceable, judicial scrutiny is required. *Metlife*, 159 N.J. at 493.[10] The position being advanced by A&P boils down to a simple question when considered against this standard. Would it be reasonable for this Court to allow A&P to receive both $134,600 in interest, plus $883,205 in "free Rent" and $66,669.35 in "free Charges"– for a total

---

[10] Generally, the question whether liquidated damage clauses are enforceable has arisen in the context where the seller is seeking to enforce the clause and the buyer is seeking to have it declared invalid. However, the roles here are reversed yet the analysis is the same in that the essential question is still whether the liquidated damages amount is reasonable in light of the anticipated or actual loss caused by the breach and the difficulties of proving the loss. *Naporano Associates, L.P. v. B & P Builders*, 706 A.2d 1123, 1128 (N.J. Super. 1998). Factors to be considered in assessing reasonableness include the intention of the parties, the parties' bargaining power, and actual damages sustained. *Metlife Capital Finance Corp.*, 732 A.2d 493.

of $1,084,474.35 – as a result of a 9 month delay in the landlord paying a $1,900,000 Construction Allowance, particularly when that delay was primarily due to a delay in financing resulting from A&P's Petition?  Assessing the totality of the circumstances, the District Court's interpretation of Section 7G is inconsistent with New Jersey law because Section 7G is an unenforceable penalty and awarding A&P $949,875.03 in free Rent and Charges is grossly disproportionate and bears no reasonable relationship to the actual damages sustained by A&P for NP's delay.

Ignoring that forfeiture provisions are to be judged against a standard of reasonableness, the District Court relied strongly upon *Dunkin Donuts*, 495 A.2d 66, holding that the forfeiture was appropriate because "NP and A&P contracted for a forfeiture and - in the absence of fraud, accident, surprise, or improper practice, none of which NP argues is present – the forfeiture will be upheld, even if it results in a windfall to A&P."  (SPA21).  In the matter of *Dunkin' Donuts*, 495 A.2d 66 , the franchisor brought action against the franchisee of two donut shops seeking to enforce its right to terminate the franchises and to collect damages because franchisee was guilty of unconscionably cheating the franchiser by underreporting gross sales.  Under the unique facts of the case, the Supreme Court held that the termination and forfeiture were valid because the franchisee committed fraud under the terms of the franchise agreement.  The clause at issue in

*Dunkin' Donuts* expressly provided that the franchise could be terminated for underreporting sales.  Additionally, the agreement provided that a breaching franchisee was required to pay as damages all amounts owed to Dunkin' Donuts as a result of the underreported sales, the full costs of the investigation, and attorney fees.  The lower courts felt that the franchisee's loss of all rights was extreme and disproportionately harsh and ordered the franchisor to pay $115,000 because of the termination.   The Supreme Court disagreed and overturned the lower court, holding that the ***equitable considerations were improper because they were without a basis with any precise figures or calculations rooted in the evidence.*** *Dunkin' Donuts,* 495 A.2d at 70 (emphasis added).  Upholding the "termination and forfeiture", the Supreme Court noted that to require the franchisor to pay the franchisee compensation for the value of the franchises would mean that an innocent franchisor (which had been defrauded) would have to pay the same compensation as a franchisor that had violated statutory requirements when terminating a franchisee without good cause.  This logic is immutable, but simply inapplicable to this case.

*Dunkin' Donuts* when correctly analyzed, is completely distinguishable from the Lease dispute in this matter. Here, NP was delayed in paying the Construction Allowance due to circumstances beyond its control—i.e., the filing of A&P's bankruptcy petition.  It is also clear that all required interest for that delay was

36

paid. There was clearly no fraud or active wrong-doing on the part of NP.  Unlike *Dunkin' Donuts*, the breach of Lease by NP does not justify a forfeiture because it would be unconscionable and unjust evaluated against a standard of reasonableness.  Unlike the franchisee in *Dunkin' Donuts*, NP has always alleged that a complete rent forfeiture under Section 7G of the Lease should be void on the basis of unconscionability.  The clause at issue here, unlike *Dunkin' Donuts*, provides that if NP failed to pay to A&P the Construction Allowance, then A&P could "abate" Rent until the Construction Allowance is received, together with interest on the unpaid balance at the rate of 9% per annum as set forth in Section 27.  This is very different than the *Dunkin' Donuts* clause that allowed termination for fraud, which is a logical remedy, even if it results in a forfeiture.  Here, the remedy available to A&P was a right to withhold Rent until the Construction Allowance was satisfied with interest.[11]  To rule that A&P will never have to pay back Rent and Charges totaling $949,875.03, as well as awarding A&P $134,600 in interest related to the late payment of the Construction Allowance (when no actual damages were suffered by A&P) would simply be unreasonable.  The only equitable result is for this Court to correct such injustice and reverse the lower courts under the clear guidelines provided by New Jersey courts.  A&P has been

---

[11] This is akin to withholding performance as "security" as discussed *supra* at pg 39-41.

fully compensated for the delay by the interest already paid by NP, and "a recognized rule of construction dictates that when a choice exists in a contract as to forfeiture, it is to be construed against rather than in favor of a forfeiture." *Lehigh*, 171 A.2d at 660.[12]  As such, because there was such a choice, the District Court erred in affirming to enforce Section 7G as a forfeiture.

In the matter of *Vanderbeek v. Barefoot,* 226 F. App'x 209, 214 (3d Cir. N.J. 2007), the court analyzed a clause which required the forfeiture of a $250,000 deposit related to the purchase of a $8.575 million property.  This was the sole remedy in the event of a breach.  The Third Circuit Court of Appeals analyzed this forfeiture clause using the liquidated damages analysis to determine whether the clause was reasonable under the totality of the circumstances at the time of formation as well as the time of the breach.  "Treating reasonableness 'as the touchstone" the court noted that the "New Jersey Supreme Court has not ruled on whether a liquidated damages clause in a commercial contract is reasonable when the non-breaching party suffers no actual damages." *Vanderbeek,* 226 F. App'x at 214.  The *Vanderbeek* court held that $250,000 was fair because it was approximately 3.5% of the purchase price and it was the sole remedy for the breach.  As such, the clause was found to be reasonable. *Id.*  While other New

---

[12] As discussed elsewhere in this brief, A&P's borrowing rate under its unused DIP facility was at all times less than the 9% interest rate paid by NP.  (AJ575-587). Thus, A&P actually profited by the delay from an interest arbitrage perspective.

Jersey courts have found that forfeitures are reasonable, those decisions are based upon the totality of the circumstances in that the forfeiture was specifically spelled out, a crime was committed, and the sole remedy provided to the breached party was the forfeiture.[13]

### i. Under New Jersey Law, Where a Forfeiture or Penalty is Intended as a Means to Secure Performance and Compensation by way of Interest is available, the Court will not Enforce the Forfeiture.

It is clear from case law that a forfeiture is considered much the same as a penalty in that "[w]here the forfeiture or penalty sought was provided merely as a means of security for the payment of money, then equity regards such payment as the principal intent of the instrument and will usually grant relief against and enjoin said forfeiture upon the payment of the amount due with interest and costs." _Galka v. Tide Water Associated Oil Co._, 30 A.2d 881 (N.J. Ch. 1943). "Equity will relieve against forfeiture where compensation can be made." _Commercial Trust Co. v. L. Wertheim Coal & Coke Co.,_ 102 A. 448, 452 (N.J. Ch. 1917). This is precisely what occurred here when NP paid all the interest due and owing

---

[13] _Gillman v. Bally Manufacturing Corp.,_ 670 A.2d 19 (N.J. App. Div. 1966), (top executive failed to exercise a portion of his stock option in time period provided under employment agreement holding "[e]quity does not ordinary aid one whose indifference was the sole cause of the injury of which he now complains". _Id_. at 530, citations omitted); _Brick Plaza Inc., v. Humble Oil & Refining Co.,_ 526 A.2d 1139 (N.J. App. Div. 1987), (court enforced option contract because time is of essence and failure to give prompt notice due to forgetfulness is not a basis for equitable relief in that "equity aids the vigilant, not those who sleep on their rights." _Id_. at 104, citations omitted.) _Rosen,_ 925 A.2d 32, (court upheld forfeiture of restricted stock in employment agreement because forfeiture was specifically spelled out that employee would "forfeit the restricted stock as well as compensation" if he left or was terminated for cause. _Id_. at 41.)

thereon, as ordered by the Bankruptcy Court, when it paid the Construction Allowance in full on September 29, 2011.

Section 7G of the Lease, as amended, provides and recognizes damages for breach in the timely payment of the Construction Allowance by providing for a contractual interest rate to be paid for the delay period. *See Galka*, 30 A.2d at 883-884.  A&P has admitted that Section 7G was intended as a means of security for the payment of the Construction Allowance, stating that it was an integral part of the Lease to account for any harm suffered from the breach by NP in paying the Construction Allowance in a timely fashion.  (JA591-592).  After the Lease was finally assumed by A&P, Plaintiff secured funding and paid the full amount of the Construction Allowance, together with interest at the Lease Interest Rate as prescribed by Section 27 of the Lease.  That payment of $2,034,671.00 included over $134,600 of interest to compensate A&P for the nine month delay in receiving the Construction Allowance.

> Wherever a penalty or forfeiture is inserted merely to secure the payment of money, or the performance of some act, or the enjoyment of some right or benefit, equity regards such payment, performance, or enjoyment as the real and principal intent of the instrument, and the penalty or forfeiture as merely an accessory, and will therefore relieve the debtor party from such penalty or forfeiture, whenever the actual damages sustained by the creditor party can be adequately compensated. *** If the principal contract is merely for the payment of money, there can be no difficulty; the debtor party will always be relieved from the penalty or forfeiture upon paying the amount due and interest.

*Blake & Co. v. Smidth*, 119 A. 306, 307 (N.J. Ch. 1922).

Because A&P has been fully compensated at the Lease Interest Rate for NP's late payment in accordance with Section 27, the District Court erred in determining that Section 7G was a valid forfeiture because A&P had already been fully and adequately compensated for such delay by the payment of interest at the Lease Interest Rate.  *Id.; see also Galka,* 30 A.2d at 883-884; *see also Commercial Trust Co.,* 102 A. at 452 .

## III.   THE DISTRICT COURT ERRED IN AFFIRMING THAT A&P COULD   WITHHOLD THE Q3 2011 TAXES UNDER THE LEASE AFTER NP CURED THE DEFAULT.

The District Court erred in holding that "A&P is not obligated to pay Q3 2011 Taxes because the taxes became due as a "Charge" under the Lease during the period when A&P could abate Charges as a result of NP's breach."  (SPA24). Failing to cite to any authority for its holding that A&P had the right to abate these Charges even after A&P requested a corrected invoice, the District Court erred as it ignored the Lease provision that provides payment to be made within 10 days following Tenant's receipt of the corrected invoice.

Payment of Real Estate Taxes is addressed in Exhibit G of the Lease, which provides as follows:

> For each Tax Year Tenant shall pay to Landlord, in the manner hereinafter provided, Tenant's Proportionate Share of Real Estate Taxes. Tenant's Proportionate Share of said Real Estate Taxes s*hall be due and payable by Tenant thirty (30) days after receipt by Tenant of a receipted*

41

> ***tax bill*** or tax bills indicating thereon the Real Estate Taxes assessed against the Shopping Center for the applicable Tax Year and quarter and a statement setting forth, in detail, the calculation of Tenant's Proportionate Share of Real Estate Taxes.

(JA99)(emphasis added). The Lease describes Tenant's Proportionate Share of Real Estate Taxes as "the sum of Tenant's Proportionate Share of the Building Real Estate Taxes and Tenant's Proportionate Share of Land Real Estate Taxes.

*Id*. Tenant's Proportionate Share of Land Real Estate Taxes is described as:

> The product of the amount of Real Estate Taxes assessed against the Land for any Tax Year and a fraction, the numerator of which shall be the total ground floor area of the Tenant's Building and the denominator of which shall be the total ground floor area of all buildings shown on Exhibit A, provided that such denominator shall not be less than total floor area of all of the buildings in the shopping center at the time of opening the Demised Premises to the public for business.

*Id*. Pursuant to the Amendment, Paragraph 7(c) sets forth:

> Tenant shall pay to Landlord Tenant's Proportionate Share of Real Estate Taxes for the period commencing on the Rent Commencement Date and ending on the last day of the month following the Effective Date (based upon tax bills issue to the Landlord as of the Effective Date), upon the later of the Effective Date or within ten (10) business days following Tenant's receipt of a receipted tax bill or tax bills indicating thereon the Real Estate Taxes assessed against the Shopping Center for such period.

(JA113).

As discussed above, immediately following the September 26, 2011 oral argument, and without prejudice to its rights in the matters ruled on that day by the Bankruptcy Court and on Appeal, NP paid to A&P the full amount of the Construction Allowance as well as interest. The Q3 2011 Taxes were due and

owing by NP to the Borough of New Providence on August 1, 2011.  NP paid the Q3 2011 Taxes to New Providence on or about August 29, 2011.  (JA553).  A&P was preliminarily billed for its portion of the Q3 2011 Taxes on August 24, 2011, together with the supporting statement required by the Lease.  *Id*.  However, A&P sought a revision with respect to its numerator seeking to apply a 42.13% rate.  (JA554-556).  NP complied and issued a final revised invoice on October 13, 2011 in the amount of $66,669.35.  (JA556).  Due to the revision, this final invoice overrode the prior invoice and controlled the due date.  As such, A&P's payment was now due within 10 days, on or before October 23, 2011.  Since that date, A&P has failed to issue any payment with respect to the Q3 2011 Taxes pursuant to the Lease.  Because the Construction Allowance had been paid in full prior to the final billing on October 13, 2011, A&P had no basis for claiming that the Q3 2011 Taxes were part of the Charges subject to abatement.  Despite these clear undisputed facts, the Bankruptcy Court, as a second reason for denying NPs application to compel payment by A&P, included those Q3 2011 Taxes as part of the "Charges" that the Bankruptcy Court determined A&P need never pay, due to the Construction Allowance payment breach that had already been cured. (SPA4-6).  This clear error below should be reversed on this Appeal as the District Court refused to address whether NP asserted a separate claim under 11 U.S.C. § 365 and did not waive what did not exist. (SPA24).

43

The Lease is even-handed between the Landlord and Tenant with respect to delays in either party's obligation to make a financial payment to the other.  NP paid dearly for its breach on September 29, 2011 when it paid over $134,600 in interest to A&P because of a nine month delay in its payment of the Construction Allowance.  The Lease also ensures that the Tenant is motivated to pay its obligations when due by establishing a procedure which "constitute[s] the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract."  *Truck Rent-A-Center v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 421 (1977).  Section 28 (Additional Charges) provides:

> If Tenant shall be in default hereunder, Landlord, after thirty (30) days notice that Landlord intends to cure such default, shall have the right, but not the obligation, to cure such default and Tenant shall pay to Landlord, upon demand, as additional charges the reasonable cost thereof plus interest at the Lease Interest Rate.

(JA70-71).

Therefore, NP is entitled to interest at the Lease Interest Rate on the Q3 2011 Taxes due and owing.  Based on the foregoing, NP respectfully requests that this Court reverse the lower courts and direct A&P to pay NP the Q3 2011 Taxes, together with interest thereon, at the Lease Interest Rate.

# CONCLUSION

For all of the foregoing reasons set forth above, the Plaintiff-Appellant N PROVIDENCE, LLC should have been granted summary judgment. Therefore, the decision of the U.S. District Court for the Southern District of New York should be reversed.

Dated:  August 15, 2014

CLEMENTE MUELLER, P.A.
P.O. Box 1296
Morristown, NJ 07962-1296
Telephone: (973) 455-8008
Counsel for Plaintiff-Appellant
N Providence, LLC


By: /S/ Jessie Christine Basner
    Jessie Christine Basner, Esq.

# CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the 14,000 word limitation of Fed. R. App.

P. 32 (a) (7) (B), in that the brief is calculated by the word processing program to

contain 11,213 words, excluding the parts of the brief exempted by Fed. R. App. P.

32 (a) (7) (B) (iii), and complies with the typeface requirements of Fed. R. App. P.

32 (a) (5) and the type style requirements of Fed. R. App. P. 32 (a) (6).


/S/ Jessie Christine Basner
Jessie Christine Basner, Esq.
(JB9528)
CLEMENTE MUELLER, P.A.
P.O. Box 1296
Morristown, NJ 07962-1296
Telephone: (973) 455-8008
Counsel for Plaintiff-Appellant
N Providence, LLC

46

SPECIAL APPENDIX

# **Table of Contents**

**Page**

Order of the Honorable Robert D. Drain (I) Granting in Part and
    Denying in Part A&P's Motions for Summary Judgment on the
    Pleadings on Count One of NP's Adversary Complaint and
    Count One of A&P's Counterclaim; (II) Denying NP's Cross-
    Motion for Summary Judgment on Count One of its Adversary
    Complaint; and (III) Granting A&P's Motion to Dismiss Count
    Two of NP's Adversary Complaint, dated March 8, 2012 ............   SPA1

Order of the Honorable Robert D. Drain (I) Granting Summary
    Judgment in Favor of the Reorganized Debtors, (II) Denying
    NP's Motion for Summary Judgment, and (III) Fixing Cure
    Claim for Taxes, dated June 21, 2013 .........................................   SPA4

Opinion and Order of the Honorable Cathy Seibel,
    dated April 28, 2014, Appealed From  ..........................................   SPA7

11-08306-rdd    Doc 18    Filed 03/08/12    Entered 03/08/12 14:56:04    Main Document
Pg 1 of 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC | ) | Case No. 10-24549 (RDD) |
| TEA COMPANY, INC., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| N. PROVIDENCE, LLC, | ) | |
| | ) | |
| | ) | Adversary Proceeding No. 11-08306 (RDD) |
| Plaintiff, | ) | |
| v. | ) | |
| THE GREAT ATLANTIC & PACIFIC | ) | |
| TEA COMPANY, INC. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

---

**ORDER (I) GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTIONS FOR JUDGMENT ON THE PLEADINGS ON COUNT ONE OF N.
PROVIDENCE, LLC'S ADVERSARY COMPLAINT AND COUNT ONE OF
DEFENDANT'S COUNTERCLAIM; (II) DENYING N. PROVIDENCE, LLC'S CROSS-
MOTION FOR SUMMARY JUDGMENT ON COUNT ONE OF ITS ADVERSARY
COMPLAINT; AND (III) GRANTING DEFENDANT'S MOTION TO DISMISS COUNT
TWO OF N. PROVIDENCE, LLC'S ADVERSARY COMPLAINT**

---

Upon: (I) Defendant's Motion for Judgment on the Pleadings on Count One of

N. Providence, LLC's Adversary Complaint (the "***Adversary Complaint***"), Pursuant to Federal

Rule of Civil Procedure 12(c) and Federal Rule of Bankruptcy Procedure 7012(b), dated July 28,

2011 [Docket No. 6] (the "***First JOP Motion***"), (II) Defendant's Motion for Judgment on the

Pleadings on Count One of A&P's Counterclaim, Pursuant to Federal Rule of Civil Procedure

12(c) and Federal Rule of Bankruptcy Procedure 7012(b), dated September 9, 2011 [Docket No.

11] (the "***Second JOP Motion***," and, together with the First JOP Motion, the "***JOP Motions***");

(III) Defendant's Motion to Dismiss Count Two of the Adversary Complaint Pursuant to Federal

Rule of Bankruptcy Procedure 7012(b) and Federal Rule of Civil Procedure 12(b)(6) for Failure to State a Claim for Which Relief Can be Granted, dated July 28, 2011 [Docket No. 4] (the "**_Motion to Dismiss_**"); and (IV) N. Providence, LLC's Cross-Motion for Summary Judgment on Defendant's Counterclaim for Declaratory Relief Pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56, dated August 9, 2011 [Docket No. 10] (the "**_Summary Judgment Motion_**" and, together with the Motion to Dismiss and the JOP Motions, the "**_Motions_**"); and consideration of the Motions and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered the pleadings and the arguments and evidence therein; and the Court having considered the arguments and representations of the parties at the hearings held on September 26, 2011 and January 24, 2012 (the "**_Hearings_**"); and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth on the record by the Court at the Hearings, it is HEREBY ORDERED THAT:

1.      The Defendant's Motion to Dismiss Count Two of NP's Adversary Complaint is granted.

2.      With respect to the Defendant's JOP Motions, the Court finds that the plain language of that particular lease between N. Providence, LLC ("**_NP_**") and The Great Atlantic & Pacific Tea Co., Inc., dated as of June 26, 2007 and amended on October 23, 2009, pertaining to a property located at 1260 Springfield Ave., New Providence, New Jersey (the "**_Lease_**"), permitted the Defendant to withhold all rent and charges for the entire period during which NP was in default on its obligation to pay the $1.9 million Construction Allowance, plus interest, under the Lease; however, the Court has reserved ruling on whether the amount that the Defendant has withheld under this provision constitutes, in whole or in part, an unenforceable

penalty or whether it constitutes reasonable damages for NP's breach.  To the extent based on any other grounds, NP's contention that the rent abatement under this provision is not permanent but is, instead, subject to offset or reimbursement, the JOP Motions are granted and NP's Summary Judgment Motion is denied with prejudice.  The remaining aspects of the Defendant's JOP Motions are denied.

3.      In light of the foregoing, NP's Summary Judgment Motion is denied at this time, without prejudice except as specifically provided herein.

4.      This Order shall be immediately effective and enforceable upon its entry.

5.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  White Plains, New York              /s/Robert D. Drain
         March 8, 2012                      Honorable Robert D. Drain
                                            United States Bankruptcy Judge

**SPA4**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GREAT ATLANTIC & PACIFIC | ) | Case No. 10-24549 (RDD) |
| TEA COMPANY, INC., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| N. PROVIDENCE, LLC, | ) | |
| | ) | |
| | ) | Adversary Proceeding No. 11-08306 (RDD) |
| Plaintiff, | ) | |
| v. | ) | |
| THE GREAT ATLANTIC & PACIFIC | ) | |
| TEA COMPANY, INC. | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

---

### ORDER (I) GRANTING SUMMARY JUDGMENT IN FAVOR OF THE REORGANIZED DEBTORS, (II) DENYING N. PROVIDENCE, LLC'S MOTION FOR SUMMARY JUDGMENT, AND (III) FIXING CURE CLAIM FOR TAXES

---

Upon: (I) The Reorganized Debtors' Motion for Summary Judgment Pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil Procedure 56, dated January 17, 2013 [Docket No. 26] (the "***Reorganized Debtors' Motion***"), and (II) N. Providence, LLC's ("***NP***") Motion for Summary Judgment, dated October 16, 2012 [Docket No. 20] ("***NP's Motion***" and with the Reorganized Debtors' Motion, the "***Motions***"); and there being due and sufficient notice of the Motions; and upon all of the responsive pleadings filed in respect of the Motions; and the Court having jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b); and consideration of the Motions and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper pursuant to 28 U.S.C.

§§ 1408 and 1409; and the Court having considered the arguments and representations of the parties at the hearings held on September 26, 2011, January 24, 2012, December 14, 2012, and April 30, 2013 (the "*Hearings*"), the record of which is incorporated herein by reference; and, upon the supplemental pleadings, each dated May 17, 2013, filed by the parties at the Court's request made at the conclusion of the Hearings, the Court having concluded that (a) NP did not timely assert a cure claim under 11 U.S.C. § 365 in respect of Third Quarter 2011 taxes claimed to be owing under the Lease, notwithstanding its present claim that such taxes are owing under the Lease in the amount of $66,669.35, and such claim therefore has been waived, (b) in any event, because such amount became due as a "Charge" under the Lease on or about September 24, 2011 while NP was in default under the Lease for purposes of section 7.G. thereof, such obligations was abated pursuant to section 7.G. of the Lease (see Lease at section 4; page 66), (c) NP correctly acknowledges that $58,019.04 of its claimed Fourth Quarter 2010 taxes have been paid, and (d) the Reorganized Debtors correctly acknowledge that $6,291.22 of Fourth Quarter 2010 taxes are due and owing under the Lease, a cure claim therefor having been timely filed by NP and such amount having become due before NP's breach of the Lease; now, therefore, after due deliberation and sufficient cause appearing for the reasons set forth on the record by the Court at the Hearings and herein, it is HEREBY ORDERED THAT:

1.      The Reorganized Debtors' Motion is granted, and the Reorganized Debtors are not liable to NP for rent or Charges under the parties' lease relating to a property in New Providence, New Jersey (the "Lease") for the period during which NP was in breach of its obligation to pay the $1.9 million construction allowance and interest thereon.

2.      NP's Motion is denied.

**SPA6**

3.      NP's Limited Objection to the Debtors' Motion to Assume Certain Unexpired Leases of Non-Residential Real Property [Lead Docket No. 2056] is denied except as expressly set forth herein.

4.      Notwithstanding anything in this Order to the contrary, within 14 days of the entry of this Order the Reorganized Debtors shall pay to NP the sum of (a) $6,291.22 and (b) interest thereon at the rate of 9% per annum from the date of such breach (see Lease section 27.A.), in satisfaction of NP's cure claim in respect of payments due and owing under the Lease on account taxes.

5.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

6.      The Clerk of Court is shall close this adversary proceeding promptly upon entry of this Order.

Dated:  White Plains, New York              /s/Robert D. Drain
       June 21, 2013                    Honorable Robert D. Drain
                                 United States Bankruptcy Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
In re:

THE GREAT ATLANTIC & PACIFIC TEA                            **OPINION AND ORDER**
COMPANY, INC., et al.

                                        Debtors.
------------------------------------------------------------------------x
N. PROVIDENCE, LLC,

                                        Appellant,
                                                                    13-CV-5588 (CS)
            - against -

THE GREAT ATLANTIC & PACIFIC TEA
COMPANY, INC.,

                                        Appellee.
------------------------------------------------------------------------x

<u>Appearances</u>:

Jessie Christine Basner
Jonathan D. Clemente
Andrea Kitzis Smith
Clemente Mueller, P.A.
Morristown, New Jersey
*Counsel for Appellant*

Paul M. Basta
Ray C. Schrock
Andrew Genser
Nathaniel J. Kritzer
Kirkland & Ellis LLP
New York, New York
*Counsel for Debtor-Appellee*

Seibel, J.

Before the Court is the appeal of N. Providence, LLC ("NP") from the Bankruptcy Court's September 26, 2011 bench ruling, (AP Doc. 14),[1] and its March 8, 2012 and June 21, 2013 Orders (AP Docs. 18, 36) (collectively, the "Order"), granting the motion for summary judgment of The Great Atlantic & Pacific Tea Company, Inc. ("A&P"), and denying NP's motion for summary judgment in an adversary proceeding commenced by NP.  The Bankruptcy Court held that under the lease between the parties, A&P was not liable for payments during a period when NP was in breach, including payments of taxes for the third quarter of 2011.  For the following reasons, the Bankruptcy Court's Order is AFFIRMED.

## I.  BACKGROUND

Although this case arises in a lengthy bankruptcy proceeding, the present issue involves little more than a breach of contract dispute between a landlord and tenant.  I set forth below only the facts relevant to the disposition of this matter.

### A.  Factual Background

NP as landlord and A&P as tenant are parties to a 20-year lease (the "Lease"), dated June 26, 2007, and amended October 23, 2009, for a shopping center located in New Providence, New Jersey.  (Compl. ¶¶ 18-20.)[2]  Under the terms of the Lease, A&P promised to construct a new facility for itself in the shopping center, and NP agreed to pay A&P a construction allowance for the completion of the work.  (*See generally* Lease Art. 7.)[3]

Specifically, Article 7, Section G of the Lease (hereinafter, "Section 7.G"), as amended, provided that NP "shall pay to [A&P]" a $1.9 million construction allowance (the "Construction

---

[1] "AP Doc." refers to documents filed in the U.S. Bankruptcy Court for the Southern District of New York under docket number 11-AP-8306.

[2] "Compl." refers to NP's Adversary Complaint filed in the Bankruptcy Court on June 28, 2011.  (AP Doc. 1.)

[3] "Lease" refers to the Lease between NP and A&P, dated June 26, 2007, as amended.  (AP Doc. 20 Ex. A.)

Allowance") on or before the ninetieth day following the date that A&P opened its store to the public. (*Id.* § 7.G; Amendment § 9(e).)[4]  The Lease provided that "if [NP] fails to pay" the Construction Allowance, then A&P's "obligation to pay fixed annual rent and Charges shall abate . . . until [A&P's] receipt of the Construction Allowance, together with interest on the unpaid balance thereof at the Lease Interest Rate (as hereinafter defined)." (Lease § 7.G.)[5]  The Lease further provided that A&P "shall have title to the [] Building and all other Improvements constructed" until A&P "shall have been fully reimbursed the Construction Allowance." (*Id.*)

The Lease also required A&P to pay to NP the portion of NP's property taxes corresponding to A&P's share of floor space in the shopping center. (*Id.* Ex. G at 66.)  Such payments thus were "Charges," defined as amounts "payable by [A&P] to [NP]" under the Lease. (*Id.* § 4.)

On September 24, 2010, A&P opened its store to the public, thereby giving NP ninety days, or until December 23, 2010, to pay the Construction Allowance. (Compl. ¶ 24.)  On October 22, 2010, NP secured a loan commitment for $19.2 million from UBS. (*Id.* ¶ 26.)  NP and UBS established a target closing date of December 16, 2010, several days before the Construction Allowance was due. (*Id.* ¶ 27.)

On December 21, 2010, four days prior to NP's projected closing date, A&P, along with fifty-three other affiliated debtors, filed petitions for chapter 11 relief in the Bankruptcy Court. (*Id.* ¶ 28; A&P Mem. 2.)[6]  UBS informed NP that it was prepared to proceed with the closing of

---

[4] "Amendment" refers to the First Amendment of Lease, dated October 23, 2009. (*Id.*)

[5] Section 27.A of the Lease defines "Lease Interest Rate" as "nine (9%) percent per annum, or if such rate is illegal, at the highest rate permitted by law." (Lease § 27.A.)

[6] "A&P Mem." refers to Brief of Reorganized Debtors-Appellees. (Doc. 14.)

the loan as soon as A&P assumed the Lease.  (Compl. ¶ 29.)[7]  A&P did not move to assume the

Lease until June 22, 2011, (*see* Bankr. Doc. 1959 Ex. 1),[8] and NP did not pay the Construction

Allowance within the ninety-day period, (Compl. ¶ 30).  As a result, A&P withheld all rent and

Charges due under the Lease from December 23, 2010, until September 29, 2011, when, after a

nine-month delay, NP finally paid the Construction Allowance.  (A&P Mem. 2.)

    B.   <u>Proceedings Below</u>

On June 28, 2011, NP commenced an adversary proceeding against A&P, seeking a

declaration from the Bankruptcy Court that the Construction Allowance owed to A&P must be

reduced by the amount of rent payments under the Lease that A&P withheld.  (Compl. ¶ 10.)  NP

argued that Section 7.G of the Lease must be read in conjunction with Section 27.A, titled

"LANDLORD'S DEFAULT," which provides that, in the event of NP's default, A&P "may

deduct from fixed annual rent and/or Charges" the amount in default "plus interest on the

outstanding balance," subject to certain limitations.  (*Id.* ¶ 23 (citing Lease § 27.A)[9].)  NP argued

---

[7] NP implies that its failure to close with UBS, and thus to pay the Construction Allowance on time, was A&P's fault for filing for bankruptcy and not immediately assuming the Lease.  (*See* Brief for Plaintiff-Appellant N. Providence, LLC ("NP Mem."), (Doc. 9), 6, 23.)  The Bankruptcy Court found, after an evidentiary hearing, in a decision that NP did not appeal, that the record did not support NP's position that the UBS loan could not be made absent A&P's assumption of the Lease.  (*See* Transcript of the September 26, 2011 Hearing before Bankruptcy Judge Robert D. Drain ("9/26/11 Hr'g Tr."), (AP Doc. 14), 153:18-21.)  In any event, the issue does not affect my resolution of this appeal.

[8] "Bankr. Doc." refers to documents filed in the U.S. Bankruptcy Court for the Southern District of New York under docket number 12-BK-24549.

[9] Section 27.A of the Lease provides, in part:

> If [NP] shall be in default hereunder, [A&P] may (i) after thirty (30) days notice that [NP] is in default in the payment of any monies which [NP] is obligated to pay to [A&P] pursuant to the terms of this Lease, deduct the amount thereof plus interest on the outstanding balance from time to time at the greater of . . . nine (9%) percent per annum, or if such rate is illegal, at the highest rate permitted by law (hereinafter called the "Lease Interest Rate") from fixed annual rent and/or Charges . . . .  Notwithstanding the foregoing, whenever [A&P] is permitted under the provisions of Subdivision 27A hereof to offset, withhold or deduct from fixed annual rent and/or Charges, said offset, withholding or deduction shall in no event exceed thirty (30%) percent of each of the next succeeding monthly installments of fixed annual rent and Charges until a court of competent jurisdiction renders a final unappealable judgment that [NP] is in default under this Lease and thereafter the aforesaid limitation shall no longer be applicable. . . .  The aforesaid limitation on the

that Section 27.A of the Lease "clearly contemplates that the abatement referred to in Section 7 shall be deemed a credit against [A&P's] obligations under the Lease." (*Id.* ¶ 9.)  The parties cross-moved for judgment on the Complaint.[10]

On September 26, 2011, the Bankruptcy Court heard oral argument on the motions and issued a partial bench ruling on the record in favor of A&P.  (*See* 9/26/11 Hr'g Tr. 148:6-154:17.)  Judge Drain concluded that "under the plain language of paragraph 7(g) [A&P] has the ability to withhold the payment of fixed annual rent and [] charges until it actually receives the construction allowance." (*See id.* at 150:4-7.)  He rejected NP's argument that Section 27.A of the Lease modified Section 7.G and "requir[ed] [A&P] to set-off versus simply withholding and abating the payment of rent until the construction allowance is paid." (*See id.* at 150:16-22, 151:17-20.)  But Judge Drain was troubled that "without any offset or deduction . . . there may be a considerable windfall to [A&P] beyond its readily imaginable or conceivable damages." (*See id.* at 154:6-10.)  For this reason, Judge Drain ordered additional briefing on "the narrow issue of the enforceability of liquidated damages provisions under New Jersey law as between sophisticated entities such as [NP] and [A&P]." (*See id.* at 154:13-17.)[11]

The parties submitted supplemental briefs on October 26, 2011, and the Bankruptcy Court issued a bench ruling on January 24, 2012, and an Order on March 8, 2012.  (*See* 3/8/12

---

offset, recoupment, withholding or deduction from fixed annual rent and Charges shall not apply to Article 7 hereof.

(Lease § 27.A.)

[10] NP sought a declaratory judgment in Count One of the Complaint, and damages from A&P in Count Two.  (*See* AP Doc. 1.)  A&P moved to dismiss Count Two, moved for judgment on the pleadings as to Count One and asserted a counterclaim for declaratory relief.  (*See* AP Doc. 6.)  NP answered A&P's counterclaim, opposed the motion for judgment on the pleadings and moved for summary judgment on Count One.  (*See* AP Docs. 9, 10.)  A&P then opposed NP's motion for summary judgment and moved for judgment on the pleadings on its counterclaim.  (*See* AP Doc. 11.)

[11] The Lease provides that it is to be construed according to the law of New Jersey.  (Lease Art. 35; *see* 9/26/11 Hr'g Tr. 149:24-25.)

Order.)[12]  In the Order, Judge Drain denied NP's motion for summary judgment, granted A&P's

motions in part, and "reserved ruling on whether the amount that [A&P] has withheld under this

provision constitutes, in whole or in part, an unenforceable penalty or whether it constitutes

reasonable damages for NP's breach."  (*See id.* at 2-3.)[13]

On October 16, 2012, NP filed a second motion for summary judgment, asking the

Bankruptcy Court to find that the abatement clause was an unenforceable liquidated damages

provision under New Jersey law, and further arguing that A&P owed NP taxes for nine days of

the fourth quarter of 2010, and for the entire third quarter of 2011.  (*See* AP Doc. 20 at 2 & n.1.)

A&P opposed the motion, arguing that the rent abatement clause is neither a penalty nor a

liquidated damages clause, but instead an enforceable forfeiture provision.  (*See* AP Doc. 21 at

8.)  A&P added that, even if the Bankruptcy Court were to construe the provision as a liquidated

damages clause, the clause was reasonable and thus enforceable under New Jersey law.  (*See id.*

at 10.)  A&P finally argued that it was entitled to withhold tax payments during the period that

NP was in breach of the Lease.  (*See* AP Doc. 22 ¶ 6.)

On December 14, 2012, after hearing oral argument from the parties, the Bankruptcy

Court preliminarily denied NP's motion, but requested additional briefing on A&P's argument

that Section 7.G was a forfeiture provision.  (*See* 12/14/12 Hr'g Tr. 74:13-23.)[14]  Judge Drain

---

[12] "3/8/12 Order" refers to the Order of the Bankruptcy Court, dated March 8, 2012, which reaffirmed the Court's findings made on the record at the September 26, 2011, and January 24, 2012 hearings.  (AP Doc. 18.)

[13] Judge Drain denied NP's motion with prejudice to the extent that it was based on grounds other than that the abatement provision was an unenforceable penalty.  (*See* 3/8/12 Order at 2.)  By disposing of the motion in this manner, Judge Drain preserved for future review the question of whether the abatement provision was enforceable under New Jersey law, but prevented NP from raising new arguments in support of summary judgment.

[14] "12/14/12 Hr'g Tr." refers to the Transcript of the December 14, 2012 Hearing before Judge Drain.  (AP Doc. 25.)  At the hearing, Judge Drain concluded that summary judgment was inappropriate because there were "material, factual issues" as to whether Section 7.G was enforceable when viewed "through the prism of the liquidated damages versus unenforceable penalty[] analysis."  (12/14/12 Hr'g Tr. 73:8-16.)

granted A&P leave to move for summary judgment, (*see id.* at 76:3-21), which A&P did on January 17, 2013, (AP Doc. 26).

On April 30, 2013, the Bankruptcy Court heard oral argument on A&P's motion for summary judgment and issued a bench ruling in A&P's favor.  (*See* 4/30/13 Hr'g Tr.)[15]  As for whether the abatement clause is best construed as a liquidated damages, penalty, or forfeiture provision, Judge Drain concluded that the "only rubric by which to evaluate the effectiveness of section 7(g) is under New Jersey's law as it applies to forfeiture provisions."  (*See id.* at 58:23-25.)  Judge Drain noted that the provision "does not provide for the payment of a specific sum as damages but instead provides that [NP's] right to obtain rent is abated, that is[,] lost."  (*See id.* at 58:13-17.)  On the issue of whether the abatement provision was enforceable under New Jersey law, Judge Drain concluded that it was, finding that "New Jersey has a strong policy in enforcing the unambiguous terms of a contract even if they create hardship for one of the parties," (*see id.* at 59:6-8), that "a court of equity will not interfere with that contract term in the absence of fraud, accident, surprise or improper practice," (*see id.* at 60:15-19 (quoting *Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 100 N.J. 166 (N.J. 1985)), and that there was "no evidence [] in the record showing" any of those things, (*see id.* at 62:25-63:1).

Judge Drain deferred ruling on NP's argument that it was owed Fourth Quarter 2010 and Third Quarter 2011 taxes, and ordered the parties to submit additional briefing on the issue.  (*See id.* at 66:6-67:2.)  The Bankruptcy Court reviewed the parties' submissions, and entered an Order, dated June 21, 2013, which granted A&P's motion for summary judgment, denied NP's cross-motion for summary judgment and fixed NP's claim for taxes.  (*See* 6/21/13 Order.)[16] Judge Drain concluded that NP was entitled to an additional $6,291.22 for Fourth Quarter 2010

---

[15] "4/30/13 Hr'g Tr." refers to the Transcript of the April 30, 2013 Hearing before Judge Drain.  (AP Doc. 42.)

[16] "6/21/13 Order" refers to the Order, dated June 21, 2013, of Judge Drain.  (AP Doc. 36.)

taxes, having already received $58,019.14 in taxes from A&P, but was not entitled to Third Quarter 2011 taxes. (*See id.* at 2.) Judge Drain found that NP had failed to timely assert a cure claim under 11 U.S.C. § 365 for Third Quarter 2011 taxes,[17] and in any event, that A&P was allowed to abate these taxes because they became due as a "Charge" under the Lease while NP was in default. (*See id.*)

C.  Appeal

On July 3, 2013, NP filed a timely Notice of Appeal. (Doc. 1.) On appeal, NP argues that the Bankruptcy Court erred in granting summary judgment to A&P and permitting A&P to withhold all rent and Charges for the nine-month period during which NP failed to pay the Construction Allowance. (*See* NP Mem. 11-12.) Specifically, NP challenges the Bankruptcy Court's conclusions that:  1) Sections 7.G and 27.A of the Lease do not provide for a set-off or credit against the Construction Allowance owed to A&P; 2) Section 7.G is an enforceable forfeiture provision under New Jersey law; and 3) NP was not entitled to Third Quarter 2011 taxes. (*See id.*)

II.  **DISCUSSION**

A.  Legal Standard

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final judgments, orders, and decrees of a bankruptcy court. A district court reviews a bankruptcy court's findings of fact for clear error and reviews its legal conclusions *de novo. Overbaugh v.*

---

[17] Section 365 of the Bankruptcy Code allows the "trustee, subject to the court's approval, [to] assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). On June 21, 2011, A&P moved to assume certain unexpired leases, which included the Lease with NP. (*See* Bankr. Doc. 1959 Ex. 1.) With this motion, A&P set forth proposed "cure" amounts, to be paid upon assumption, indicating that the amount owed to NP was $0.00. (*See id.*) NP claims to have filed a limited objection to A&P's motion, (*see* NP Mem. 29), although it appears that NP actually objected to A&P's earlier motion for entry of an order extending the time for A&P to assume or reject the Lease, (*see* Bankr. Doc. 620). Regardless, NP does not assert that it raised the Third Quarter 2011 taxes in any objection to A&P's asserted cure amount, nor could it have done so, because A&P filed its motion to assume before the third quarter of 2011. Nor does NP assert that it later sought these taxes through other means.

*Household Bank N.A.* (*In re Overbaugh*), 559 F.3d 125, 129 (2d Cir. 2009) (per curiam); *see* Fed. R. Bankr. P. 8013 (district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree").

B. Abatement under Section 7.G

NP first challenges the Bankruptcy Court's interpretation of Section 7.G of the Lease. (*See* NP Mem. 12-17.) The Bankruptcy Court held that, under Section 7.G of the Lease, A&P was allowed to withhold rent and Charges without crediting the withheld amounts against the Construction Allowance. NP argues that the plain language of the Lease, along with the clear intent of the parties, supports interpreting Section 27.A to modify Section 7.G and allow for a set-off of rent and Charges against the Construction Allowance. (*See id.*) A&P responds that the Bankruptcy Court correctly interpreted the Lease as providing a "customary abatement, not a set-off right." (*See* A&P Mem. 6-12.)

Under New Jersey law,[18] a court examines a lease through the lens of traditional contract interpretation. *Textron Fin.-N.J. Inc. v. Herring Land Grp., LLC*, No. 06-CV-2585, 2012 WL 1079613, at *16 (D.N.J. Mar. 30, 2012); *see Mayfair Supermkts., Inc. v. Acme Mkts., Inc.*, No. 87-CV-3994, 1989 WL 32133, at *7 (D.N.J. Apr. 3, 1989) ("[C]urrent New Jersey law construes lease agreements under the same guidelines employed to interpret contracts."). The court's objective "is to determine the intent of the parties," *Kieffer v. Best Buy*, 205 N.J. 213, 223 (N.J. 2011), and it must ascribe to the lease's terms their plain and ordinary meaning, *Schor v. FMS Fin. Corp.*, 357 N.J. Super. 185, 191 (N.J. Super. Ct. App. Div. 2002). "The judicial task is simply interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves." *Kieffer*, 205 N.J. at 223.

---

[18] NP strangely cites New York cases on the rules of contract interpretation. (*See* NP Mem. 14-15; A&P Mem. 7.)

Reviewing the plain language of Section 7.G of the Lease, the Court is not persuaded that the parties intended for rent and Charges to be set off against the Construction Allowance. Section 7.G unambiguously states that if NP fails to pay the Construction Allowance, then A&P's "obligation to pay fixed annual rent and Charges shall abate." (Lease § 7.G.)  The term "abatement" is defined as "[t]he act of eliminating or nullifying." *Black's Law Dictionary* 3 (9th ed. 2009).  A&P's obligation to pay rent and Charges was eliminated during the period that NP failed to pay the Construction Allowance.  Thus, the Bankruptcy Court correctly held, under the plain meaning of Section 7.G, that the Lease does not provide for rent and Charges to be set off against the Construction Allowance.[19]

NP argues that Section 27.A of the Lease undermines this interpretation of Section 7.G and requires that the Construction Allowance be set off against the abated rent and Charges. Here, NP relies on two provisions of Section 27.A.  The first states that A&P's right "to offset, withhold, or deduct" amounts when NP is in default is capped at thirty percent of the next month's payment, but that that cap does not apply to Article 7 of the Lease.  (Lease § 27.A.)[20] The second is the definition of "Lease Interest Rate," which is set forth in Section 27.A and

---

[19] A&P further asserts that this outcome is consistent with two cases from New Jersey, *City of Atl. City v. Cynwynd Invs.*, 148 N.J. 55, 63 (N.J. 1997) (no indication that abated rent would be set off), and *Westrich v. McBride*, 204 N.J. Super. 550, 557 (N.J. Super. Ct. Law Div. 1984) (tenant allowed to abate rent in the amount of additional electricity charges), which recognize the right to abate rent without a subsequent set-off.  (*See* A&P Mem. 9.)  NP responds that reliance on *Cynwynd* and *Westrich* is misplaced because the tenants in those cases reduced the rent in direct proportion to the damages caused by the landlord's breach, but A&P's abatement is not proportional to its damages.  (*See* Reply Brief for Plaintiff-Appellant N. Providence, LLC ("NP Reply Mem."), (Doc. 15), 1-2.)  But neither *Cynwynd* nor *Westrich* hinged on the proportionality of the abatement to the damages.  The two cases instead affirm that the plain meaning of the term "abate" implies an elimination and not a set-off.

[20] Section 27.A provides that A&P's right to "offset, withhold or deduct . . . shall in no event exceed thirty (30%) percent of each of the next succeeding monthly installments of fixed annual rent and Charges," but that "[t]he aforesaid limitation on the offset, recoupment, withholding or deduction from fixed annual rent and Charges shall not apply to Article 7 hereof."  (Lease § 27.A.)

applies to Section 7.G by cross-reference.  (*Id.*)[21]  The Court is not persuaded that either provision warrants a departure from the plain meaning of Section 7.G.

NP first contends that because one provision of Section 27.A – the thirty-percent limitation on A&P's right "to offset, withhold, or deduct" – does not apply to Article 7, the remaining parts of the Section must apply to that Article, including Section 7.G.  (*See* NP Mem. 14.)  NP's argument appears to be that there would be no need to carve out Article 7 from the thirty-percent cap if Section 27.A did not otherwise apply to it in the first place.[22]  While this argument has some facial appeal, I am unpersuaded.  First, it does not follow that the carve-out can only mean that the remainder of Section 27.A applies to Article 7.  It would be quite logical for the parties simply to want to make clear that the thirty-percent cap of Section 27.A does not apply to Article 7.  In other words, the provision on which NP relies can most reasonably be interpreted as meaning no more than what it says, without implying that Section 7.G is in fact an offset provision despite its plain language to the contrary.  Second, there are other provisions in Article 7 that specifically provide for "offset, recoupment, withholding or deduction" if NP fails to satisfy the conditions of the Lease, (*see* Lease § 7.A; *id.* § 7.H),[23] and thus it is perfectly logical for Section 27.A to carve out Article 7 from its thirty-percent cap, without that carve-out

---

[21] Section 27.A defines the term "Lease Interest Rate" as "nine (9%) percent per annum, or if such rate is illegal . . . the highest rate permitted by law."  (*Id.* § 27.A.)  Section 7.G allows abatement until NP pays the Construction Allowance plus interest on the unpaid balance "at the Lease Interest Rate (as hereinafter defined)."  (*Id.* § 7.G.)

[22] NP's argument seems to be a variation on the doctrine of *expressio unius est exclusio alterius, i.e.*, "expressing one item of [an] associated group or series excludes another left unmentioned."  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (internal quotation marks omitted).  NP argues that the exclusion of one portion of Section 27.A from applying to Article 7 must mean that the remainder of Section 27.A applies to Section 7.G.  It seems to the Court, however, that if the parties so intended, they would have included something to that effect in the Lease, rather than leaving it to a convoluted inference.  In any event, the inference is unwarranted for the reasons stated in the text.

[23] Section 7.A provides that "[i]f [NP] fails to comply with the requirements of [§] 7D(2)] . . . , then [A&P] shall have the right to [] commence or complete . . . such work which [NP] shall have failed to complete . . . and recoup the cost and expense thereof.").  Similarly, Section 7.H provides that "[i]f [NP] shall not have satisfied each of the conditions set forth in [§] 8(A) . . . [A&P] shall have the right [] to . . . commence or complete the satisfaction of . . . the conditions . . . and recoup the cost and expense thereof.").

meaning that every provision of Article 7 constitutes an offset, recoupment, withholding or deduction.

As the Bankruptcy Court found, NP and A&P are "sophisticated parties," (*see* 9/26/11 Hr'g Tr. 153:17), and presumably they knew how to draft a lease. That they chose not to provide for set-off under Section 7.G persuades the Court to reject NP's suggestion that the parties intended for Section 27.A to modify Section 7.G.

The Court is equally unpersuaded by NP's argument that because Section 7.G refers to the term "Lease Interest Rate," and Section 27.A defines the term "Lease Interest Rate," Section 27.A must apply to Section 7.G. (*See* NP Mem. 16-17.) The cross-reference between Sections 7.G and 27.A serves to define the rate at which interest on the Construction Allowance must be paid; it does not imply that Section 27.A otherwise modifies Section 7.G. Contract provisions frequently incorporate definitions from other parts of the contract, and such incorporation has no effect on the substance of the incorporating provision. *Cf. Am. Asphalt Co. v. Cnty. of Gloucester*, No. L-1412-08, 2011 WL 1119064, at *4, *8 (N.J. Super. App. Div. Mar. 29, 2011) (rejecting plaintiff's argument that contract's "generic cross-reference" to New Jersey standards "necessarily subsumed all of the relevant provisions in those [] standards," such that contract allowed for price escalation, which was otherwise contrary to contract's language).

NP also argues that because the parties did not amend Section 27.A when they amended Section 7.G, they intended for Section 27.A to apply to Section 7.G. (*See* NP Mem. 15.) But NP overlooks that A&P's obligation to pay rent and Charges also "abate[d]" under the pre-amendment version of Section 7.G. (*See* Lease § 7.G.) The Amendment to the Lease merely adjusted the amount of the Construction Allowance, reducing it from $2 million to $1.9 million, and the conditions under which rent and Charges abated. (*Compare id.* § 27.A, *with* Amendment

**SPA19**

§ 9(e).)  The Amendment provides no basis for inferring that the parties intended to modify the plain abatement language of Section 7.G.

NP finally argues that Section 27.A must apply to Section 7.G to prevent A&P from experiencing a windfall of $949,875.03.  (*See* NP Mem. 15.)  NP asserts that, without set-off, A&P will be allowed to keep the Construction Allowance plus interest, along with the abated rent and Charges, even though A&P had full use of the building during the entire period of NP's breach.  (*See* NP Reply Mem. 2.)  The Court recognizes that A&P may emerge from this dispute with a significant profit, but the Lease contemplates such an outcome, and the Court's task "is not to rewrite a contract for the parties better than or different from the one they wrote for themselves." *Kieffer*, 205 N.J. at 223.  The Court therefore affirms the Bankruptcy Court's conclusion that Section 7.G provides for an abatement of rent and Charges, without set-off, during the period that NP was in breach of the Lease.[24]

C.  Section 7.G as an Enforceable Forfeiture Provision

NP next contends that the Bankruptcy Court erred in construing Section 7.G as a forfeiture provision where the Lease did not expressly provide for forfeiture and controlling authority dictates that contracts be construed against forfeiture.  (*See* NP Mem. 18-19.)  NP further contends that, even if Section 7.G is a forfeiture provision, the provision is unenforceable under New Jersey law because A&P was adequately compensated for NP's breach via interest.  (*See id.* at 19-21.)  NP finally argues that a forfeiture provision, similar to a liquidated damages clause, must be reasonable, and here the amount of forfeiture is plainly unreasonable because it

---

[24] This outcome is consistent with the final provision of Section 7.G, which provides that A&P "shall have title to the [] Building and all other Improvements," until NP pays the Construction Allowance.  (Lease § 7.G.)  Because A&P was the title-holder during the period NP failed to pay the Construction Allowance, NP was not entitled to collect rent, *see Four-G Corp. v. Ruta*, 25 N.J. 503, 507 (N.J. 1958) (noting that "rents which accrue before title passes belong to the vendor"), and NP should not be allowed to recoup rent that it was not entitled to collect in the first place.

"does not bear a reasonable relationship to the actual damages sustained by A&P for NP's delay." (*See id.* at 21-27.)

With respect to whether Section 7.G is a penalty, liquidated damages or forfeiture provision, A&P responds that Section 7.G falls squarely within the definition of "forfeiture" because NP "lost its right to collect rent [and Charges]," (*see* A&P Mem. 12), and is "wholly inconsistent with the definition of a 'penalty' under New Jersey law," (*see id.* at 13). A&P adds that, despite NP's argument otherwise, there is no requirement under New Jersey law that a provision use the term "forfeiture" to qualify as a forfeiture provision. (*See id.* at 17.) A&P further argues that courts in New Jersey will not interfere with contract terms, even where the terms create a hardship for a party, absent fraud, accident, surprise, or improper practice, all of which are absent in the present case. (*See id.* at 13-16.) A&P finally asserts that reasonableness has no bearing on whether a forfeiture provision is enforceable under New Jersey law. (*See id.* at 19-20.)

The Bankruptcy Court correctly construed Section 7.G as a forfeiture provision. A "forfeiture" is defined as "[t]he loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty." *Black's Law Dictionary* 722. Section 7.G abates A&P's obligation to pay rent and Charges upon NP's breach of its obligation to pay the Construction Allowance, and thus NP's right to collect rent and Charges is lost, or forfeited, in the event of breach. That Section 7.G does not expressly use the term "forfeiture" does not affect the Court's analysis. *See Dunkin' Donuts*, 100 N.J. at 173 (agreement that "rights of the Licensee [] shall cease" qualified as forfeiture);[25] *Brick Plaza, Inc. v. Humble Oil & Refining Co.*, 218 N.J. Super. 101, 103-05 (N.J. Super. App. Div. 1987) (tenant forfeited right to purchase property where right

---

[25] Despite NP's suggestion otherwise, (*see* NP Mem. 19), the Supreme Court in *Dunkin' Donuts* did not state that a provision must "expressly call" for a "forfeiture" to qualify as a forfeiture provision. *See* 100 N.J. at 182.

to purchase was expressly conditioned on tenant giving "written notice . . . of its intention to exercise such purchase option," and tenant failed to give notice). Moreover, Section 7.G is plainly inconsistent with the definition of a penalty or liquidated damages clause under New Jersey law because the Section does not provide for a specific sum to be paid in the event of breach. *See Westmount Country Club v. Kameny,* 82 N.J. Super. 200, 205 (N.J. Super. App. Div. 1964) ("Liquidated damages is the sum a party . . . agrees to pay . . . to estimate in advance the actual damages . . . . A penalty is the sum a party agrees to pay . . . but which is fixed . . . ."). Rather, the amount of abated rent and Charges will vary based on the length of NP's breach. Thus, the Bankruptcy Court properly construed Section 7.G as a forfeiture provision.

The Bankruptcy Court also correctly determined that Section 7.G is enforceable under New Jersey law. *Dunkin' Donuts* remains the seminal New Jersey case on the enforceability of forfeiture provisions. There the Supreme Court of New Jersey held that "if parties choose to contract for a forfeiture, a court of equity will not interfere with that contract term in the absence of fraud, accident, surprise, or improper practice." 100 N.J. at 182. The Court in *Dunkin' Donuts* reversed the lower court, which had partially relieved a franchisee from an agreement that divested his entire interest in his franchise based on his breach of the agreement. *Id.* The lower court acted to prevent an "inappropriate windfall" to the franchisor, but the Supreme Court held that forfeiture was appropriate where the parties had contracted for such an outcome "in the absence of fraud, accident, surprise, or improper practice." *Id.* As in *Dunkin' Donuts*, NP and A&P contracted for a forfeiture and – in the absence of fraud, accident, surprise, or improper practice, none of which NP argues is present – the forfeiture will be upheld, even if it results in a windfall to A&P.

SPA22

NP attempts to distinguish *Dunkin' Donuts* on several grounds, (*see* NP Mem. 21-24), none of which are persuasive.  NP first argues that, unlike the franchisee in *Dunkin' Donuts* who intentionally breached the franchise agreement, "NP was delayed in paying the Construction Allowance due to circumstances beyond its control."  (*See id.* at 23.)  But NP provides no authority for the proposition that this difference matters when deciding whether to enforce a forfeiture under New Jersey law.  Second, NP argues that forfeiture would be "unconscionable and unjust" because A&P has been compensated for NP's breach through NP's interest payments.  (*See id.*)  That the Lease provides a windfall for A&P as a result of NP's breach does not rise to the level of unconscionability.[26]  Moreover, NP's subsequent remedy of its breach should not deprive A&P of its bargained-for right to abate rent and Charges.[27]  In sum, the *Dunkin' Donuts* decision provides controlling authority under which this Court will enforce Section 7.G as a forfeiture provision.[28]

---

[26] Unconscionability "involves both procedural and substantive elements" and "requires a two-fold determination: that the contractual terms are unreasonably favorable to the drafter and that there is no meaningful choice on the part of the other party regarding acceptance of the provisions."  *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 276-77 (3d Cir. 2004) (internal quotation marks omitted).  Even assuming the first, substantive requirement were met, NP does not argue, nor is there evidence to suggest, that the Lease was procedurally unconscionable, and thus the Court rejects NP's suggestion that the Bankruptcy Court's outcome was unconscionable.

[27] NP cites to three ancient cases from New Jersey, *Galka v. Tide Water Associated Oil Co.*, 30 A.2d 881 (N.J. Ch. 1943), *Commercial Trust Co. v. L. Wertheim Coal & Coke Co.*, 102 A. 448 (N.J. Ch. 1917), and *Blake & Co. v. Smidth*, 119 A. 306 (N.J. Ch. 1922), as standing for the principle that the Court should exercise its equitable power to relieve NP from a forfeiture of rent and Charges because NP has fully compensated A&P for its breach.  (*See* NP Mem. 21.)  These cases fail to support NP's position.  In *Galka*, the court refused to grant relief from a forfeiture where, as here, the dispute was a legal one under a contract and "no equitable rights nor equitable defenses [were] involved."  30 A.2d at 884.  In *Commercial Trust*, the court had an equitable basis to relieve a lessee from a forfeiture because the lessor had waived all defaults under the lease and was estopped from asserting the default, 102 A. at 452, but equity has no bearing here because NP seeks a remedy at law.  *Blake*, where the court relieved a tenant from a forfeiture for failing to pay rent after the tenant paid back rent, 119 A. at 307, is arguably the closest to the instant case, but the Court is not persuaded that New Jersey courts would strike down the instant forfeiture provision under the *Blake* decision.  First, no cases in New Jersey have cited *Blake* since the 1940s.  Second, it seems to reflect a tenant-friendly interpretation that it might well not have applied at the behest of a landlord.  Third, *Dunkin' Donuts* is now the controlling law and that decision plainly suggests that a forfeiture will be enforced in the present circumstances.

[28] The Court also rejects NP's suggestion that the abatement, if viewed as an interest payment, would violate New Jersey usury laws.  (*See* NP Mem. 28 n.11; NP Reply Mem. 5.)  A&P's rent abatement was not a loan to NP, and the Court sees no reason to extend state usury laws to the present action.

NP also attempts to import a reasonableness inquiry into the Court's forfeiture analysis. NP contends that, under New Jersey law, the "enforceability of a forfeiture provision [must be] judged against the standard of reasonableness." *Rosen v. Smith Barney, Inc.*, 393 N.J. Super. 578, 592 (N.J. Super. App. Div. 2007). NP fails to acknowledge that this language from *Rosen* follows a discussion on contract formation – namely whether "plaintiffs voluntarily entered into the agreement, [and whether] the terms of the investment plans were fully disclosed, the participants were knowledgeable, sophisticated, and could weigh the potential risks against the rewards." *Id.* In other words, the reasonableness inquiry in *Rosen* related to the process by which the parties reached their agreement, not the terms of the agreement. NP does not suggest that the concerns that animated *Rosen* (which in any event cannot trump *Dunkin' Donuts*) are present here. The Court therefore affirms the Bankruptcy Court's finding that Section 7.G is an enforceable forfeiture provision.

   D.   <u>Third Quarter 2011 Taxes</u>

   NP finally argues that the Bankruptcy Court erred in finding that A&P does not owe $66,669.35 in Third Quarter 2011 taxes. (*See* NP Mem. 28-33.) NP contends that the Bankruptcy Court erroneously found that NP waived its claim to these taxes by failing to "timely assert a cure claim under 11 U.S.C. § 365," and that even if NP had not waived its claim, A&P was not obligated to pay these taxes because they became due as a "Charge" under the Lease while NP was in breach of the Lease for failing to pay the Construction Allowance. (*See id.*)

   A&P responds that Third Quarter 2011 taxes were not part of the proceedings below, and that NP needed to assert a separate claim for that amount in the adversary proceeding or as an administrative claim. (*See* A&P Mem. 21.) A&P also argues that even if NP did not need to

assert a separate claim for the taxes, A&P's obligation to pay them abated because NP was in breach when they came due. (*Id.* at 22-23.)

Assuming that NP has not waived its claim to collect Third Quarter 2011 taxes, A&P is not obligated to pay Third Quarter 2011 taxes because these taxes became due as a "Charge" under the Lease during the period when A&P could abate Charges as a result of NP's breach. As explained above, Section 7.G of the Lease permits A&P to abate payment of rent and Charges during the period of NP's breach, which began on December 23, 2010, and extended through September 2011. "Charges" are defined in the Lease as "all other charges payable by [A&P] to [NP]," (Lease § 4), which includes taxes A&P owed to NP under the Lease provision requiring A&P to reimburse NP for its proportional share of NP's property taxes, (*id.* Ex. G at 66). Under the Lease, A&P has to pay NP for taxes thirty days after NP invoices A&P for them. (*Id.*) There is no dispute that NP first invoiced the Third Quarter 2011 taxes on August 24, 2011, making A&P's payment due on September 23, 2011. (*See* AP Doc. 35 Ex. 2.) Nor is there any dispute that NP was in breach at that time for failing to pay A&P the Construction Allowance. Thus the Third Quarter 2011 taxes were a Charge that A&P was entitled to abate. That NP later submitted a second invoice on October 13, 2011, after it had cured its breach, (*see id.* Ex. 3), does not change the fact that NP first invoiced these taxes during the period when A&P had the right to abate these Charges. For this reason, I affirm the Bankruptcy Court's conclusion that NP is not entitled to collect $66,669.35 in Third Quarter 2011 taxes.[29]

---

[29] Because I find that A&P's obligation to pay taxes abated, I need not address whether NP was required to assert a separate claim, under 11 U.S.C. § 365 or otherwise, and if so, whether NP should be permitted to file a late claim. (*See* NP Reply Mem. 6-9.)

**SPA25**

III.  <u>**CONCLUSION**</u>

For the reasons stated above, the Order of the Bankruptcy Court is AFFIRMED.  The

Clerk of Court is respectfully directed to docket this decision and close the case.

**SO ORDERED.**

Dated:  April 28, 2014
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.